# STATE v. GREAT NORTHERN RAILWAY COMPANY.[1]

March 2, 1928.

No. 23,542.

AFTER REARGUMENT.

**Gross earnings tax on railroads constitutional as applied to defendant's iron ore tonnage carried to its docks in Wisconsin.**

The Minnesota tax on railroads, based on gross earnings, is a property tax and is constitutional when the statutory mileage prorate is applied to the iron ore tonnage originating in Minnesota and carried by the defendant and loaded into the boats from its docks in Allouez Bay on the Wisconsin shore of Lake Superior.

Taxation, 37 Cyc. p. 846 n. 85, 86.

See 26 R. C. L. 189.

Action in the district court for Ramsey county. There was judgment for the plaintiff, Hanft, J. which was affirmed. 160 Minn. 515. A motion for reargument was denied. Upon appeal to the Supreme Court of the United States the action was dismissed for want of jurisdiction. 273 U. S. 658. Upon motion of the defendant this court, supra, p. 1, vacated its judgment of affirmance and granted a reargument on the question of the constitutionality of the tax statute under the federal constitution. Judgment affirmed.

*F. G. Dorety* and *Thomas Balmer,* for appellant.

*Clifford L. Hilton,* Attorney General, *G. A. Youngquist,* Assistant Attorney General, and *Patrick J. Ryan,* for the state.

DIBELL, J.

Our original opinion affirming the judgment of the district court for omitted taxes of the defendant is reported in 160 Minn. 515, 200 N. W. 834. A motion for reargument was denied. An appeal was taken to the Supreme Court of the United States, and it was there dismissed for want of jurisdiction resulting from an insufficient setting forth and waiver of the claim of a substantial federal

[1] Reported in 218 N. W. 167.

constitutional question in the court below. 273 U. S. 658, 47 S. Ct. 343, 71 L. ed. 401. Thereafter, on motion of the defendant, we vacated our judgment of affirmance and granted defendant's supplemental motion for a reargument that it might urge a claim that the tax statute was unconstitutional under the federal constitution, supra, p. 1. The hearing now before us is upon such claim. The evidence and record are the same.

The statute defines the gross earnings of a railroad within the state as "all earnings on business beginning and ending within the state, and a proportion, based upon the proportion of the mileage within the state to the entire mileage over which such business is done, of earnings on all interstate business passing through, into or out of the state." G. S. 1923, § 2247. Every railroad pays into the treasury, in lieu of a tax on all property within the state owned or operated for railway purposes, a sum of money equal to a stated per cent of its gross earnings. G. S. 1923, § 2246. There is no local levy or other tax. The proceeds of the railroad tax go into the general revenue of the state. The state is a single taxing unit. There is no local distribution.

The so-called gross earnings tax is a property tax. The amount of it is measured by gross earnings. It is not a tax on gross earnings accruing on traffic in or out of Minnesota. It is not a tax on property in a state other than Minnesota. That a tax on property may be computed on the basis of gross earnings, as is not unusual in the case of railroads and other common carriers and telephone and telegraph companies, is no longer questioned. Cudahy Packing Co. v. Minnesota, 246 U. S. 450, 38 S. Ct. 373, 62 L. ed. 827, affirming 129 Minn. 30, 151 N. W. 410; U. S. Exp. Co. v. Minnesota, 223 U. S. 335, 32 S. Ct. 211, 56 L. ed. 459, affirming 114 Minn. 346, 131 N. W. 489, 37 L.R.A.(N.S.) 1127. A property tax measured by gross earnings may be really a subterfuge and so disregard value or so burden interstate commerce that it is unconstitutional. A so-called gross earnings tax may be constitutional or it may be so drawn as to be unconstitutional. Maine v. Grand Trunk Ry. Co. 142 U. S. 217, 12 S. Ct. 121, 35 L. ed. 994; Pittsburgh, C. C. & St. L. Ry. Co. v. Backus, 154 U. S. 421, 14 S. Ct. 1114, 38 L. ed. 1031; Pullman Co.

v. Richardson, 261 U. S. 330, 43 S. Ct. 366, 67 L. ed. 682; Wis. & Mich. Ry. Co. v. Powers, 191 U. S. 379, 24 S. Ct. 107, 48 L. ed. 229; Fargo v. Hart, 193 U. S. 490, 24 S. Ct. 498, 48 L. ed. 761; Oklahoma v. Wells, Fargo & Co. 223 U. S. 298, 32 S. Ct. 218, 56 L. ed. 445; Southern Ry. Co. v. Kentucky, 274 U. S. 76, 47 S. Ct. 542, 71 L. ed. 934.

The valuation of railroad property for taxation is difficult. At the best it is an approximation and not an exact determination. That there is a relation worthy of consideration in taxation between gross earnings and mileage is generally conceded.

At the trial it was not urged that the so-called gross earnings tax was unconstitutional, and no evidence was offered for the purpose of showing it to be so. The defendant made certain deductions for seven miles of the haul at the lake end before the application of the statutory prorate upon the theory that it had a contract with the Allouez Bay Dock Company or its predecessor for a carriage of such distance; or if it did not that it was entitled to make such a deduction as a service charge. In short, it applied the statutory prorate in a proportion of 87 to 107, the Minnesota and the total mileage, but deducted certain sums which it claimed represented either the contract price or value for the carriage for the last seven miles.

The trial court found that the defendant's ore line from the mines in Minnesota to the water front on Allouez Bay in Wisconsin was a single continuous railway line for which a single charge for a continuous and unbroken railway service from mine to boat was made. It found that it was a Great Northern operation and in effect a Great Northern ownership. The ore was carried for a fixed charge from the mines and put into boats in the waters of Lake Superior just as other roads carried ore and unloaded it in boats on the same waters. After 1906 the Great Northern published a tariff for a completed carriage. Before that its actual tariff, though not published, was for a continuous haul.

There was slight evidence that railroads at the head of the lakes during the period in question did not add to their tariff a charge for loading ore into the boats, or make a service charge; and an

offer by the state of plenary proof of such fact, framed with particularity, was excluded on objection of the defendant. It is not out of place to give the statement of the interstate commerce commission in Lum v. G. N. Ry. Co. 33 I. C. C. 541, 545, made in 1915, when considering tariff rates on ore going to the head of the lakes and into the boats:

"The rate for the transportation of iron ore from the Vermillion, Mesabi, and Cuyuna ranges to the docks at Two Harbors, Duluth, Allouez Bay, and Superior is uniformly 60 cents per long ton regardless of distance. This rate covers the service from the mouth of mine or stock pile to the dock, the dumping of the ore into the dock, storage in the dock until a cargo is completed, and loading into the boats."

On the former appeal we sustained the trial court's finding that the transfer from mine to boat was one haul undertaken by the Great Northern for a specific rate, all of which it received, though the lower end of the haul was under the name of a corporation all of the stock of which it owned and the profits of which it received in the form of dividends. The finding could hardly be different, and the facts are noted in some detail in the former opinion.

The ore haul from the Mesaba mines, the source of the defendant's ore supply in Minnesota, was 107 miles to its ore docks on Allouez Bay, Wisconsin, 87 miles in Minnesota and 20 miles in Wisconsin, or 81.55 per cent in Minnesota. Prior to August 1, 1909, when the through rate was 80 cents per ton, there was deducted by the defendant for the dock haul and the six miles west to Saunders where the exclusive ore line branched to the dock 25 cents, leaving 55 cents for the long haul of 100 miles. From that date until December 25, 1911, the deduction was 22 cents, leaving 58 cents for the 100-mile haul. In 1912, when the rate was 60 cents, the deduction was 15 cents and the long haul was 45 cents. The railroad applied the mileage prorate of 81.55 per cent after the deductions we have stated. In other words, it deducted these sums from its gross earnings before it applied the statutory mileage prorate. We hear nothing further about the rate except, as stated in the original opinion, there

was a rate of 95 cents in 1919, with a storage and unloading charge of 5 cents; but, as there observed, there being in the period involved no appreciable amount of ore not going over the dock, the 5 cents additional was insignificant. The real tariff was one dollar.

The defendant now bases its claim of unconstitutionality upon what it claims is a proportionate difference in value in the two states of the property used in carrying ore.

No evidence was offered at the trial upon the relative values of the defendant's property in Minnesota and in Wisconsin as compared with mileage in support of a claim of unconstitutionality. There was no claim of unconstitutionality either in the trial court or in this court on appeal or on the first motion for reargument. The claim in this court came in the supplemental petition for reargument after the dismissal of the appeal to the Supreme Court of the United States. Evidence was given of the investment of the company for the latter five years of the ten-year period involved apparently upon the theory that it was reasonable to allocate to a subsidiary or an allied or owned company 25 or 22 or 15 cents per ton for the lower end of the haul, or to deduct such sum as a service charge. The defendant claimed that its books showed in 1912 an accumulated investment for the dock of $5,294,137; for trackage from the dock to the state line, $1,676,686; and thence to the mines in Minnesota, $10,878,951. There was a book showing of equipment investment of $7,178,051. The defendant gains no advantage from the equipment account. The only witness called for the defendant, entirely frank in his testimony, knew only that in some way these various figures were upon the books as representing investment. They were figures for some purpose—for what purpose does not appear—or, as the witness puts it in explaining the figures for the five years, "it happened that these were compiled for another purpose and so I could get them without delay."

To maintain its claim of unconstitutionality the defendant in a way segregates 107 miles of its railway system, 87 miles from its 2,000 miles in Minnesota, and 20 miles from its mileage in Wisconsin. It does not do this quite completely. It takes no account of the grain traffic coming to the head of the lakes over its line

through Hinckley to the west and southwest, nor from its Fosston branch which reaches northern Minnesota and the states farther west and Canada. It takes no account of incoming freight except iron ore. It takes no account of outgoing freight. It takes no account of passenger traffic coming to the head of the lakes, either to Duluth or Superior, or originating there and going west over its lines. It takes account of one commodity, iron ore, and rejects all others. But all this incoming and outgoing passenger and freight traffic passes over the tracks which carry iron ore in Wisconsin, with the exception of seven miles. Its ore traffic passes from Saunders, Wisconsin, as far north as Swan River, or perhaps farther, in Minnesota, over tracks which carry through traffic, passenger and freight, both ways. There are branches or stubs in Minnesota which are exclusively for iron ore and the usual tracks in connection with open pit mines. None of its freight or passenger traffic can reach its docks or depots at Superior or Duluth without passing over tracks which carry iron ore. What the use value is of trackage employed in common by ore and non-ore traffic, and how it should be apportioned, there is nothing to tell us. We do know that a transcontinental line makes common use of much of the ore-carrying trackage in reaching the head of the lakes and in going from it, and that it cannot reach the Great Lakes except by using trackage which its ore traffic uses in both Minnesota and Wisconsin.

The evidence as to the values of specific portions of the ore line is far from satisfactory. Whether the dock account of $5,294,137 was properly charged as respects capital or maintenance for taxing purposes we do not know. The trial court made no finding. It was not asked to do so. There was no inquiry. Neither party considered these matters of anything but incidental or trivial consequence and of no constitutional bearing for there was no constitutional question. If the Minnesota gross earnings tax is invalid as a whole, as it affects the defendant's 2,000 miles of trackage in Minnesota, or as it affects the 87 miles with its enormous tonnage and gross earnings, it should be found so after a definite inquiry into the facts. And we do not have them.

Whether the defendant claims that the gross earnings tax is wholly unconstitutional is not clear. It is in an apparent position to say that it does for it has not said that it does not. But there is nothing to show that it pays for its whole mileage in the state more than it should upon a fair valuation. Nor is it a matter of concern what it pays in Wisconsin. The only question is whether it pays too much in Minnesota. More likely its claim is that the statute is unconstitutional as to the mileage prorate when applied to the 107-mile ore haul. The defendant urges that the 107 miles might well be considered as if a separate road. Of course it is not. The ore which it carries can get to its dock only by using a large part of its trackage used for other traffic. The evidence gives us no basis for the apportionment of its value according to use by ore and non-ore traffic. In its brief the defendant almost complains that the ore trackage cannot be considered one road. If it could be there apparently would be a government recapture; and since it cannot be, the satisfactory earnings must contribute to the dividends of the whole line. They cannot be separated so as to decrease taxes.

The taxing authorities must take gross earnings as they find them. They do not fix earnings. Back in 1912 when the rate was lower and the tonnage presumably much less, the road was making over $8,000,000 per annum on a 107-mile haul, or earnings of $78,000 per mile, all for a six-months year, and for a traffic which moved rapidly and easily. If earnings at all comparable were spread over its 2,000 miles of mileage in Minnesota they would be fabulous. Whatever bearing large earnings have on tariff rates they do not argue for a decrease of taxes. Large earnings give value, and the road has a unitary value which cannot be disregarded because one mile costs for construction more than others.

Our construction should favor sustaining the statute if reasonably it may be sustained, for it is the result of a long sustained legislative policy. If it is unconstitutional it should fall. Minnesota has hardly known anything other than a tax measured by gross earnings. From territorial times a gross earnings tax has been a cherished privilege of railroad charters. 6 Dunnell, Minn.

Dig. (2 ed.) § 9541, et seq.; Edgerton, Minn. Railroad Laws. It has worked satisfactorily and without much litigation. In the litigation which has arisen the railroads have been found on the side of sustaining the statute. 6 Dunnell, Minn. Dig. (2 ed.) § 9543, et seq.

With the state and subordinate taxing bodies anxious for new sources of revenue an ad valorem or some other system might afford the taxing bodies additional revenue or induce attempts to get it. If the gross earnings system continues, litigation should not be invited where large terminals are located near a state border and receive freight over a line where values on a mileage basis may be unequal. The property of the railroad is taxable at its value as a going concern. The ore traffic originates in Minnesota. The rate is not unduly competitive. The road which has the privilege of carrying the ore, whether through direct ownership or indirect ownership or control through subsidiaries, or through contracts with mines in which it is not interested, makes the earnings. No other could. Without such ownership or control or contracts ore-carrying roads would not have their present value nor make their present great earnings. We cannot see that the statutory scheme of taxation is unconstitutional or that the tax which it imposes works a hardship upon the defendant through an excessive valuation. Such earnings give the defendant's property great value which reflects itself in taxes.

Judgment affirmed.

HILTON, J. took no part.