## TAYLOR et al. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 6031.

Circuit Court of Appeals, Seventh Circuit.
March 26, 1937.

Rehearing Denied May 24, 1937.

John E. Hughes and Raymond·S. Pruitt, both of Chicago, Ill., for petitioners.

Robert H. Jackson, Asst. Atty. Gen., and Sewall Key, L. W. Post, and Berryman Green, Sp. Assts. to the Atty. Gen., for respondent.

Before EVANS, Circuit Judge, and LINDLEY and BRIGGLE, District Judges.

EVANS, Circuit Judge.

The facts were stipulated. Petitioners and their wives owned all the stock of the T. F. Co. which they sold in May, 1925, to B. U. Co. for $750,000 and 10,000 shares of stock. The tax on the profits of this sale is not involved in the case before us, although the transaction which is the subject of this controversy grew out of this sale. As one of the considerations of this sale petitioners entered into a written agreement with T. F. Co. wherein they agreed, in consideration of the transfer of Liberty Bonds of the par value of $145,000 to them, to "assume and pay all additional United States income and excess profits taxes ultimately found to be due from T. F. Company for the years 1917 to 1924 inclusive." They also agreed to save T. F. Co. harmless and defend it without expense against all claims and demands of the United States Government for any additional income and excess profits tax for said years.

The T. F. Co. relinquished any right to recover back any part of the Government bonds in the event the claims of the United States should ultimately be adjusted at less than $145,000. There was, at the time, pending before the Board of Tax Appeals, a tax claim against T. F. Co. for the years 1917 to 1920 in the sum of $133,917.08. This dispute was settled in February, 1929, by stipulation of parties. It was agreed that the corporation was entitled to classification as a personal service corporation and the claim against it was dismissed. The tax on its income for the years in question was chargeable against the company's stockholders. Petitioners signed waivers of their personal tax liability for the years 1917 to 1920, inclusive. The Commissioner then asserted a tax claim against petitioners for the corporation's income for said years. This claim was contested but ultimately decided in favor of the Commissioner in 1936. Petitioners' tax was assessed at $50,991.33. Petitioners incurred attorneys' and accounting fees amounting to $33,286.04 so that the total cost of discharging their obligation was $84,277.37. Both petitioners made returns on the basis of cash receipts and disbursements. The Board sustained the Commissioner in his ruling that the income in question was taxable in 1929.

Petitioners assert that their profits out of this transaction were taxable in the year 1925, not 1929, and as an alternative position they contend that if not taxable income in 1925 said profits should be included in petitioners' 1936 incomes.

It is apparent that the vital question for determination is the ascertainment of the year in which this gain should be included. It seems that an ever increasing number of appeals involve the year when gains occur. With changing incomes, the taxpayer is naturally desirous of seeking the year of small taxable income and avoiding the year when his income is larger. While this is perfectly proper and lawful, it leads to disputes which present vexatious and often difficult questions.

Petitioners did not include any part of the $145,000 in their 1925 income returns. The revenue agent insisted upon its inclusion. The petitioners protested to the Commissioner against its inclusion and their objections were sustained. The final determination of their tax liabilities for 1925 did not include any part of this $145,000.

The basis of petitioners' protest which the Commissioner allowed was that there could be no valid inclusion of this $145,000 item until the amount of the tax due from the corporation was determined. If petitioners were ultimately required to pay all or more than $145,000 to the Government, they would enjoy no gain or profit out of the transaction. On the other hand if the amount due the United States for T. F. Co.'s taxes was less than $145,000 there would be a taxable gain represented by the difference between the two amounts. This, we take it, was the substance of petitioners' objection to the inclusion of said $145,000 in the 1925 return, as well as the basis of the Commissioner's ruling in their favor.

Petitioners now contend that this sum of $145,000 should have been included in their 1925 income and as it is now too late to do so because of the statute of limitations, the Commissioner is without remedy. At least, it cannot be included in the 1929 income.

Respondent argues that petitioners are estopped to assert that the $145,000 was by them taxably received in 1925.

The Commissioner argues that to permit a taxpayer to mislead the Government and then repudiate the position thus taken is unconscionable and the taxpayers should be estopped from asserting that the income was received in 1925. Stearns Co. v. United States, 291 U.S. 54, 54 S.Ct. 325, 78 L.Ed. 647. Petitioners, on the other hand, argue

that they are not estopped because of the position taken by them in 1925 (Helvering v. Salvage, 297 U.S. 106, 56 S.Ct. 375, 80 L.Ed. 511; Sturm v. Boker, 150 U.S. 312, 14 S.Ct. 99, 37 L.Ed. 1093; Botany Worsted Mills v. U. S., 278 U.S. 282, 49 S.Ct. 129, .73 L.Ed. 379; Hulburd v. Commissioner, 296 U.S. 300, 56 S.Ct. 197, 80 L.Ed. 242); that the Government should not have accepted their argument made at the time but should have insisted upon the inclusion of this item in the 1925 returns; that argument and deception in respect to a legal proposition (as distinguished from factual misrepresentation) are not grounds for an estoppel. In other words, petitioners assert a distinction between standards established by law as a valid basis for an estoppel and standards established by decent self-respecting citizens in ordinary business transactions.

■ As to the defense of estoppel, it is elementary that respondent must show that because of petitioners' representations to him he took a disadvantageous position.

This defense could be clearly established in the instant case were it not for the fact that the representations and urges of petitioners were not matters upon which respondent could or should have relied. It is argued that they involved legal propositions or matters of law which all persons are bound to know and that an unsound legal proposition, however soundly advanced, plausibly presented or vigorously asserted, affords no excuse for action by another, because all (including the Commissioner) are legally chargeable with the knowledge of its fallacy, unsoundness or error.

If the representations made by petitioners were limited strictly to the application of a revenue act to a complete, accurate statement of facts which were not in dispute and which did not or could not give rise to different inferences, it is clear that no estoppel would arise. The difficulty is not over the existence of such a rule of law, but arises out of the facts to which the doctrine is to be applied.

. Did petitioners represent to the Commissioner facts, which, if true, would have excluded the value of the Liberty Bonds from their 1925 incomes? The answer to this question is not as obvious, as petitioners' counsel now assert.

Whether the value of these bonds should have been included in the 1925 incomes may turn upon the character of their possession by the petitioners. In seeking to ascertain the character of this possession, it is significant in the first place that bonds, not cash, were turned over to the petitioners. The transfer of cash would not as readily permit of trust creation implications as the transfer of bonds or other securities. Cash as such is not as readily ear-marked nor as ordinarily used as security for transactions which may be closed only in the distant future.

Nor can we avoid or ignore the object or purpose of this transaction. Why did the taxpayer turn over the bonds to the petitioners, its stockholders? The answer is obvious—to make sure of the payment of the taxes and thus protect the purchaser of the stock.

The four stockholders were transferring all the stock of the taxpayer to another company. The taxpayer was about to merge into a larger company. It had thus far failed to pay all of its Federal income taxes. The purchasing company was, of course, vitally interested in seeing that T. F. Co. paid its taxes. It desired protection against the possibility of being compelled to pay this tax itself. For, if these taxes were not paid by the assignor or its stockholders, then the purchaser would be liable therefor. Neither the stockholders nor the defunct company might at all times be able to pay the taxes which were constantly growing larger because of interest accumulations. It was to meet this situation that the arrangements were made whereby petitioners were permitted to *retain* the $145,000 of Liberty Bonds and pay all the 1927 to 1920 income taxes.

If it were an absolute transfer of the Liberty Bonds the purchasing company would have obtained no additional security for the payment of these taxes. Moreover without the transfer of the bonds, the taxpayer would have been liable for the Federal taxes. Likewise the stockholders who received the money could have been held as "distributees." If petitioners' present theory be accepted, no additional protection to the purchaser resulted from the transfer of the bonds to the stockholders. The conditions and circumstances under which the petitioners held the bonds may therefore have been a most important fact in the determination of the 1925 income tax liability.

■ The facts concerning the character of the possession of these bonds were known to the petitioners. They were not known

to the Commissioner. The representations and assurances of taxpayers thereon were representations of facts, not representations of law.

As bearing upon these fact representations, petitioners filed a memorandum with the Commissioner to show the impropriety of including $145,000 of Liberty Bonds in their 1925 incomes. The document was called a protest. Therein petitioners said: "This protest is based on the fact that under the terms of a certain contract dated May 9, 1925, Liberty Bonds in the aggregate sum of $145,000 were to be *retained* by this taxpayer and his associate in consideration of their assumption of and agreement to pay the unpaid income tax." In this same protest they further said: "Prior to said date arrangements had been made for the sale to B. U. Co. of all the stock of T. F. Co. and it was understood by the purchaser of the stock that they were to acquire T. F. Co. *free* and *clear* of all obligations for any additional income taxes * * * and that Taylor and Bateman were personally to assume said tax liability and in consideration thereof were to receive said Liberty Bonds from the corporation."

These representations were made by petitioners in order to avoid the inclusion of the Liberty Bonds in their 1925 returns. They were fact representations. The Commissioner accepted them. They avoided a tax assessment for the year 1925 which would otherwise have included these bonds. They should not now be permitted to assert that the word *"retained"* meant *sold*. They should be held to the consequences which follow a transfer of bonds to themselves to be by them *retained* to secure the payment of T. F. Co.'s taxes.

It is unnecessary to rest our decision on petitioners' estoppel for we are satisfied that the Liberty Bonds did not constitute a part of petitioners' 1925 taxable income.

We are convinced that the position taken by them in 1925 was the correct and sound one. It is true they received Liberty Bonds to the amount of $145,000 in 1925 but they were to pay therefrom whatever taxes were found to be due for certain years from T. F. Co. The amount of such taxes had been fixed by the Commissioner at $133,917.08. To hold that the petitioners were subject to a tax on the $145,000, although all or a large part of that sum was to be paid the United States

in satisfaction of its tax claim pursuant to the agreement of the parties, would be both unjust and unlawful. The bonds did not represent gain nor did they represent profit. Until the final determination of the T. F. Co.'s taxes it was impossible to say what, if any, profits would result.

■ It is well settled that income taxes are concerned only with realized gains. Paper profits or estimated profits are not realized gains until the property is sold—that is until the transaction is completed.

■ We conclude that 1925 was not the proper year for the inclusion of value of these bonds. Stoner v. Commissioner (C. C.A.) 79 F.(2d) 75; Commissioner v. Cleveland Trinidad Paving Co. (C.C.A.) 62 F.(2d) 85; Lucas v. American Code Co., 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538, 67 A.L.R. 1010; North American Oil Consol. v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197.

Petitioners' entire argument is based upon the fact that they acquired physical possession of $145,000 of Liberty Bonds *in 1925*. They seemingly overlook the fact that this was but the first step in a business transaction; that the second step in said transaction was an adjudication and payment of the tax against T. F. Co. When that tax was determined and paid, the transaction was completed. The profit was then certain. This was in 1929.

■ Petitioners also contend that a very substantial portion of the $145,000 of Liberty Bonds over and above the $84,277.37 disbursed in payment of taxes and fees as above related, to-wit, $52,000, is nontaxable on another ground. The T. F. Co. had itself paid taxes on this amount as corporate income for the years 1918 to 1921, and petitioners cite section 115 (e) of the Revenue Act of 1928 (26 U.S.C.A. § 115 (e) and note) in support of their contention of nontaxability. This section provides that "any distribution made by a corporation, which was classified as a personal service corporation * * * out of its earnings or profits * * * shall be exempt from tax to the distributees." Respondent, however, claims that this section is inapplicable, because the petitioners received the $52,000 not as a "distribution" as that word is used in section 115 (e) but as partial consideration for a contract with the T. F. Co., a transaction utterly different from that contemplated by the said section.

With this position of respondent we fully agree.

The orders of the Board of Tax appeals are

Affirmed.