UNITED STATES SMELTING, REFINING & MINING
CO. v. HAYNES, County Treasurer.

No. 6931.  Decided January 6, 1947.  (176 P. 2d 622.)

See 61 C. J. Taxation, sec. 800; 51 Am. Jur. 660.

*Grover A. Giles,* Atty. Gen., *Zar E. Hayes* and *Arthur H. Nielsen,* Deputy Attys. Gen., and *A. Pharis Johnson,* Co. Atty., of Tooele, for appellant.

*Cheney, Jensen, Marr & Wilkins,* of Salt Lake City, for respondent.

LARSON, Chief Justice.

This action involves the construction of Sec. 80-5-57, U. C. A. 1943, relative to determining the base or valuation of

metalliferous mines for tax purposes. As far as pertinent to this case, the statute reads:

Section 80-5-56.

"All metalliferous mines and mining claims, both placer and rock in place, shall be assessed at $5 per acre and in addition thereto at a value equal to two times the net annual proceeds thereof for the calendar year next preceding * * *."

Section 80-5-57 defines the phrase "Net annual proceeds," and provides in part:

"The words, 'net annual proceeds,' of a metalliferous mine or mining claim are defined to be the gross proceeds realized during the preceding calendar year from the sale or conversion into money or its equivalent of all ores from such mine or mining claim extracted by the owner or lessee, contractor or other person working upon or operating the property, including all dumps and tailings, during or previous to the year for which the assessment is made, less the following, and no other, deductions: * * *."

The matter resolves upon the question as to how the *gross proceeds realized* are to be determined. The issue grows out of the following facts: Plaintiff and respondent, hereinafter called the mine, operates a smelting and refining business and also owns and operates in the state of Utah a certain metalliferous mine called the Hidden Treasure. For the calendar year 1943, the State Tax Commission, hereinafter called the commission, fixed the net proceeds of the smelter's mine at the sum of $18,962.88, which was doubled, and a tax base fixed at $37,926. On such valuation Tooele County levied a tax for the year 1944 in the sum of $667.50, which amount was paid under protest and this action instituted against defendant as County Treasurer, hereinafter called the county, to recover the amount so paid.

During the present World War, and to prevent or control inflation, the Federal Government set up Office of Price Administration, which fixed or prescribed ceiling prices on the sale of many articles including metals. Finding it necessary or advisable to increase the production of certain stra-

tegic metals without disturbing the price structure, the government set up the Metal Reserve Company to carry out a plan jointly arranged by the War Production Board and the Office of Price Administration designed to increase the output of such metals. This plan provided for the fixing of certain quotas of production for non-ferrous metal mines, and permitted the Metal Reserve Company to pay to the producer of metals a fixed subsidy or "premium payment" per pound over and above the O. P. A. ceiling price for metals produced by the mine in excess of its fixed quota. These payments were designed to encourage and make possible the mining, extraction and refining of submarginal ores which otherwise would not be "pay-dirt." They were paid to the producer by the Metal Reserve Company monthly upon certificates from the smelter showing the quantity of the various metals, over the assigned quota, delivered to the smelter from the mine.

Under the facts as stipulated in the trial court, the commission included in the gross proceeds of the mine the premium payments made by the Metal Reserve Company for over-quota production. Had these premium payments not been included in the computation of gross proceeds, there would have been no taxable net proceeds. The mine contends these payments were bounties or subsidies and not proceeds realized from ores extracted from the mine. The sole question for our determination is: Are premium payments to be included in computing gross proceeds realized from ores extracted from the mines within the meaning of Section 80-5-57, U. C. A. 1943? The argument hinges upon the meaning of the phrase

*"The gross proceeds realized * * * from the sale or conversion into money or its equivalent of all ores from such mine * * * extracted by the * * * person working upon or operating the property."*

The county argues that these words cover and include all moneys received from, or on account of, the extraction of metalliferous ores which have been sold or rendered and con-

verted into such condition that its monetary value is readily ascertainable. The mine contends that the words include only money or its equivalent received from a purchaser as the price the purchaser pays for the metals sold to it by the mine. In examining the expression, we first note the word *proceeds*. Perhaps the best definition is that given by the Nebraska court in *State ex rel. Ledwith* v. *Brian*, 84 Neb. 30, 120 N. W. 916, 917, where it is defined as "the amount proceeding or accruing from such possession or transaction" —the "yield, issue product." The Texas court in *Ladd* v. *Upham*, Tex. Civ. App., 58 S. W. 2d 1037, 1039, quoted with approval the foregoing definition and added the words "income, receipt, or return." Valuation is figured on the proceeds *realized*. Money, property or profits realized usually means brought into possession. *Lorillard* v. *Silver*, 36 N. Y. 578. The word does not include paper profits or estimated profits. *Taylor* v. *Commissioner of Internal Revenue*, 7 cir., 89 F. 2d 465. *Realize* is usually used in contrast to "hope" or "anticipation." *Lorillard* v. *Silver*, supra. But it need not be "cash in hand" to be realized gain or income, since for taxation purposes income is "received" or "realized" when it is made subject to the will and control of the taxpayer, and can be, except for his own action or inaction, reduced to actual possession. *Loose* v. *United States*, 8 Cir., 74 F. 2d 147, 150. Taxes assessed and payable in one year, but not actually collected until the next year are nevertheless revenues "realized" as of December 31st of the year assessed within a statute providing that revenues realized for the first year should be applied to certain indebtedness. *Houston County* v. *Peach County*, 168 Ga. 813, 149 S. E. 219, 220. When a taxpayer obtains money by issuing an obligation which he later discharges for less than face value, taxable gain exists, since money need not be sold or exchanged to be "realized." *Commissioner of Int. Rev.* v. *American Chicle Co.*, 2 cir., 65 F. 2d 454. And where corporation bought assets of another corporation, and assumed payment of seller's bonds, differences between face of bonds purchased in 1922, 1924 and 1925 and sums less than face

paid therefor were taxable as "realized gains" absent proof that the buyer suffered a loss on the whole transaction. *Helvering* v. *American Chicle Co.*, 291 U. S. 426, 54 S. Ct. 460, 78 L. Ed. 891. When used in connection with the conversion of claims or demands into money "realize" is a very broad term. *Bettiner* v. *Gomprecht*, 28 Misc. 218, 58 N. Y. S. 1011, 1013.

We conclude that "the gross proceeds realized" as used in this section of the statute, means the total or whole amount in money, or other things of value, that has been received or which the owner may receive or take possession of at his pleasure, or to which he is entitled on demand, and which accrues to him from the sale or conversion into money or its equivalent of ores extracted from the mine or mining claim.

Are the "premium payments" money received from a sale or conversion into money or its equivalent of ores extracted from the mine or mining claim? That the "premium payments" are tied tight to ores extracted from a mining claim is not disputed, nor could it well be. These payments are made only on the metals produced from a mine or mining claim over the assigned quota. But the statute confines the tax base to proceeds realized from: (a) a sale of ores or metals; (b) a conversion of ores or metals into money or the equivalent of money. We consider them in the reverse order.

Premium payments apply only to ores shipped to the smelter or reduction works. They are made on the basis of the determined metal content of the precipitates and concentrates delivered to the smelting company. In other words, the premium payments are made only on and when the ores extracted from the mine are converted into concentrates or bullion where the quantity of the various metals is readily determinable and the value thereof easily computable. When the extracted ores have been converted or refined into metals in such form that they have a ready market at definite or readily determinable prices so that at any time the miner can dispose of them and receive

the money therefor, they have been converted into the equivalent of money, and are to be included in the computation of gross proceeds for the purpose of fixing valuation or tax base. *Salt Lake County* v. *Utah Copper Co.*, 10 Cir., 93 F. 2d 127 (certiorari denied 303 U. S. 652, 58 S. Ct. 750, 82 L. Ed. 1112). See also Sec. 80-5-59, U. C. A. 1943; *Mercur Gold Mining & Mill. Co.* v. *Spry*, 16 Utah 222, 52 P. 382. But in fixing the value or monetary equivalent of the refined metals bullion or concentrates for determination of the gross proceeds, are the premium payments to be included as part of the proceeds realized from ores extracted from the mine? There can be no question but that these premium payments accrue to the miner from the converting, or rendering, into a marketable condition (the equivalent of money) of ores extracted from the mine. They are therefore "proceeds realized" from ores extracted from such mine. And since the tax base or valuation is fixed from the gross, total or whole proceeds so accruing, these payments must be included in computing the gross proceeds realized.

Are they moneys received from a sale of ores or metals? These ores or metals belonged, and as far as the record shows, still belong to the miner. If such is correct, there never was a sale, and these moneys could not be received from a sale of the ores or metals. But if the fact be that these ores or metals extracted therefrom were or have been sold, then under our decision in *Combined Metals Reduction Co.* v. *State Tax Commission*, 111 Utah 156, 176 P. 2d 614, these payments would constitute part of the proceeds received from a sale, and properly be a part of the gross proceeds realized. The writer dissented from the opinion in that case and expressed his views therein. However, while that opinion stands it binds the writer, as well as the bar and laymen, and I accept it as the law of this jurisdiction. It follows that whether the metals have been sold or retained by the miner, the premium payments are part of the gross proceeds realized from ores extracted from

the mine, and are to be included in computing the tax base or valuation of the mine for tax purposes.

The miner contends that the inclusion of these premium payments in the computations was taxation of the means used by the Federal Government in the prosecution of the war and was a direct levy on the activities ■ and facilities of the Federal Government. No tax is levied under these proceedings against any Federal agency nor against any funds paid by such agency.

The statute involved prescribes a rule for determining the valuation of mines for assessment purposes. The gross proceeds realized are mere units considered in the formula for measurement of assessable value.

The test is well stated in *Helvering* v. *Claiborne-Annapolis Ferry Co.*, 4 Cir., 93 F. 2d 875, 876, wherein an exemption from taxation was claimed on moneys paid as

"A contribution by the state towards the maintenance of the public ferry."

This contention was rejected by the court:

"On the second question, there can be no question but that the operation of a public ferry as a link in the state highway system is a proper function of the state and that the proceeds of such operation by the state itself would not be subject to the federal income tax (*Jamestown & Newport Ferry Co.* v. *Commissioner*, 1 Cir., 41 F. 2d 920); but it by no means follows that the income of a private corporation engaged in operating such a ferry would not be subject to such tax. Cf. *Susquehanna Power Co.* v. *State Tax Commission of Maryland*, 283 U. S. 291, 293, 51 S. Ct. 434, 435, 75 L. Ed. 1042; *Broad River Power Co.* v. *Query*, 288 U. S. 178, 181, 53 S. Ct. 326, 327, 77 L. Ed. 685; *South Carolina Power Co.* v. *South Carolina Tax Commission*, D. C., 52 F. 2d 515, 526. Nor is the payment made by the state to a private corporation necessarily exempt from such tax because made as compensation or part compensation for a service which the state itself might have performed. *Metcalf & Eddy* v. *Mitchell*, 269 U. S. 514, 46 S. Ct. 172, 174, 70 L. Ed. 384; *Underwood* v. *Commissioner*, 4 Cir., 56 F. 2d 67."

The leading case on this subject is *James* v. *Dravo Contracting Co.*, 302 U. S. 134, 58 S. Ct. 208, 211, 82 L. Ed.

155, 114 A. L. R. 318. West Virginia, imposing a tax of two per cent upon the "gross income of the business" of any person engaged in the business of contracting, included in taxpayer's "gross income" the amounts received by him from the Federal Government for the construction of locks and dams upon Federal property in the state. The Supreme Court of the United States in holding such tax valid stated:

"The tax is not laid upon the government, its property, or officers. *Dobbins* v. *Commissioners*, 16 Pet. 435, 449, 450, 10 L. Ed. 1022.

"The tax is not laid upon an instrumentality of the government. *McCulloch* v. *State of Maryland*, 4 Wheat. 316, 4 L. Ed. 579; *Osborn* v. *Bank of The United States*, 9 Wheat. 738, 6 L. Ed. 204; *Gillespie* v. [*State of*] *Oklahoma*, 257 U. S. 501, 42 S. Ct. 171, 66 L. Ed. 338; *Federal Land Bank* [*of New Orleans*] v. *Crosland*, 261 U. S. 374, 43 S. Ct. 385, 67 L. Ed. 703, 29 A. L. R. 1; *Clallam County*, [*Wash.*] v. *United States*, 263 U. S. 341, 44 S. Ct. 121, 68 L. Ed. 328; *People of* [*State of*] *New York ex rel. Rogers* v. *Graves*, 299 U. S. 401, 57 S. Ct. 269, 81 L. Ed. 306. Respondent is an independent contractor. The tax is nondiscriminatory."

Answering the contention of the taxpayer that the tax increased the cost to the government of the services rendered, the court said:

"But if it be assumed that the gross receipts tax may increase the cost of the government, that fact would not invalidate the tax."

This assessment of the mine is not a tax on the Federal Government nor upon its agencies or facilities. The federal statutes and regulations empowering these premium payments made no pretense at exempting them from the state assessment formula. See *Ford J. Twaits Co.* v. *Utah State Tax Commission*, 106 Utah 343, 148 P. 2d 343.

It is urged that to include these premium payments in "proceeds realized" for the purpose of determining the valuation of the mine for assessment purposes, would violate the constitutional requirements as to uniformity of assessment and taxation as required by Sections 2, 3 and 4 of Art. XIII, Constitution of Utah, and Section 8 of Art. I, and Section I of the Fourteenth Amend-

ment to the Constitution of the United States. The Utah Constitutional provisions are as follows:

"Sec. 2. All tangible property in the State, not exempt under the laws of the United States, or under this constitution, shall be taxed in proportion to its value, to be ascertained as provided by law * * *."

"Sec. 3. The Legislature shall provide by law a uniform and equal rate of assessment and taxation on all tangible property in the State, according to its value in money, and shall prescribe by law such regulations as shall secure a just valuation for taxation of such property, so that every person and corporation shall pay a tax in proportion to the value of his, her, or its tangible property * * *."

"Sec. 4. All metalliferous mines or mining claims, both placer and rock in place, shall be assessed as the Legislature shall provide."

It will be observed that these provisions require that all tangible property, including metalliferous mines, shall be subjected to a uniform and equal rate of assessment according to its value in money. The method or yardstick by which the valuation in money is to be determined shall be prescribed by the legislature. It is not required that the same yardstick or method of determining value shall be used with respect to all kinds of property. But the different formulae which may be applied to different kinds of property must be such that they aim and tend to secure for assessment purposes a valuation fair and equitable in comparison with and commensurate with the valuation of other kinds of property. When the valuation thus secured is such that if the uniform and equal rate of taxation is applied to the valuation the property is taxed in the same proportion to its value as is all other tangible property, the method of arriving at the assessed valuation is not subject to constitutional objections as violative of Article XIII. It is conceded that the statutory method of valuing metalliferous mines for taxation purposes at $5 per acre plus a multiple or sub-multiple of the net proceeds is a proper and constitutional formula for determining the value of the mines for assessment purposes. See *South Utah Mines & Smelters* v. *Beaver County,* 262 U. S. 325, 43 S. Ct. 577, 67 L. Ed.

1004; *Mercur Gold Mining & Milling Co.* v. *Spry*, 16 Utah 222, 52 P. 382; *Salt Lake County* v. *Utah Copper Co.*, 10 cir., 294 F. 199; *Tintic Standard Mining Co.* v. *Utah County*, 80 Utah 491, 15 P. 2d 633; *Byrne* v. *Fulton Oil Co.*, 85 Mont. 329, 278 P. 514. But it is argued that to include premium payments in the gross proceeds of mines violates the rule because: (a) It amounts to a classification of mines into different groups for taxation purposes. (b) In determining the value of the mine in 1944, it takes into consideration the production of the mine in 1941 as well as the proceeds in 1943. (c) The value of the mine would be based inversely upon the production quotas fixed by the government instead of upon the net proceeds. (d) It amounts to fixing values upon gross costs rather than upon net proceeds. The arguments to sustain these points are rather abstruse and tenuous. Instead of analyzing and answering each argument, we shall consider the basic question and therein dispose of all points raised.

The matter involved in this case is not the price received from copper, lead or zinc; it is not the quantity of ore mined nor the cost of mining same; it is not the quotas fixed by the government nor the reasons for such quotas. The only matter involved is the valuation for assessment purposes of the mine on January 4, 1944. That value is fixed by statute at $5 per acre plus two times the net proceeds. In *Combined Metals Reduction Co.* v. *State Tax Commission*, 111 Utah 156, 176 P. 2d 614, decided January 6, 1947, we held that the premium payments were moneys received for metals mined and extracted from the mine. That such money becomes a part of the gross receipts from the mine is settled by that decision unless such inclusion infringes the uniformity clause of the Constitution. Use of proceeds as a basis for determining valuation for taxation purposes has been used not only for mines but railroads, motor carriers and other public utilities. The uniformity clause, when applied to formulae based upon proceeds, does not require that all individuals or companies within the class to which the formula is applied have the same income or

the same sources of obtaining their proceeds but merely that the rule for computation of proceeds apply alike—uniformly—to all within the class to which the proceeds formula applies. If as to all metalliferous mines the gross income is computed by taking all income received from the production and extraction of metals from the mine, then the application of the rule is uniform. From this is deducted certain costs allowed by the statute and the remainder is the net proceeds used in determining the tax base. In the *Mercur Gold Mining case*, supra [16 Utah 222, 52 P. 384], this court said:

"By the term 'net annual proceeds of the mine' is meant what is annually realized from the product of the mine, over and above all the costs and expenses of obtaining such proceeds and converting the same into money."

Because one mine, whether because of more efficient management, better mining equipment, stoping up for ores as distinguished from hoisting from low levels, shorter hauls, richer ores, or better smelter contract, has larger net proceeds per ton of ore mined than has another, mining the same kinds of metals, does not make the assessments discriminatory nor does it result in lack of uniformity. It does result in assessing one mine at a greater value than the other because it has a greater net return, a greater profit, more dividends, and that is an important item in the determination of value of mining property. A somewhat similar question arose in a case involving a California gross receipts tax levied on all companies "owning, operating, or managing automobile, truck" and other carrier lines. The annual gross receipts were considerably higher than the replacement value of the property owned and used in the operations. These high receipts resulted from a very lucrative government mail carrying contract. The point was urged that the value should be fixed independent of this contract; that is, at what another person without the mail contract could earn from the property. The Supreme court of the United States *(Alward* v. *Johnson,* 282 U. S. 509, 51

S. Ct. 273, 75 L. Ed. 496, 75 A. L. R. 9) upheld the right of California to collect the tax.

*State* v. *Great Northern R. Co.*, 174 Minn. 3, 218 N. W. 167, 169, involved the Minnesota law basing assessment of railroads on their gross earnings. The law was assailed on the ground that it might result in a higher tax on one railroad than on another, although the cost of building and replacing the roadbed of each would be the same. The court said:

"The taxing authorities must take gross earnings as they find them. They do not fix earnings * * * Large earnings give value, and the road has a unitary value which cannot be disregarded because one mile costs for construction more than others * * * The property of the railroad is taxable at its value as a going concern. The ore traffic originates in Minnesota. The rate is not unduly competitive. The road which has the privilege of carrying the ore, whether through direct ownership or indirect ownership or control through subsidiaries, or through contracts with mines in which it is not interested, makes the earnings. No other could. Without such ownership or control or contracts ore-carrying roads would not have their present value nor make their present great earnings. We cannot see that the statutory scheme of taxation is unconstitutional or that the tax which it imposes works a hardship upon the defendant through an excessive valuation. Such earnings give the defendant's property great value which reflects itself in taxes."

To a charge that a tax levied on the basis of mining royalties was violative of the constitutional requirements for equality of taxation, the court turned a deaf ear in *Fraser* v. *Vermillion Mining Co.*, 175 Minn. 305, 221 N. W. 13 (appeal dismissed 278 U. S. 572, 49 S. Ct. 93, 73 L. Ed. 512).

The Montana court was confronted with the same arguments as are made here with respect to the application of the uniformity of assessment clauses of the Constitution. That case, *Anaconda Copper Mining Co.* v. *Junod,* 71 Mont. 132, 227 P. 1001, did not involve "Premium Payment" but did involve the computation of net proceeds. The court held the constitutional requirements of uniformity and

equality were not violated because some mines had bigger incomes or smaller expenses on the same mining operations.

Let us note now the position of the mine. It seeks to exclude from "gross proceeds" the premium payments, but insists on deducting from the gross proceeds, without premium payments included, all the costs involved in mining, extracting and smelting the metallic ores on which the premium payments were made. The following figures, taken from the mine's brief, show the inequality that would result if their position were upheld. The Chief Consolidated Mining Company in 1943 received as gross proceeds, as it would have them construed, limited to smelter returns, the sum of $125,227.92. In addition thereto the Chief Consolidated received from the government premium payments for said metals in the sum of $492,238.84, which the state seeks to include in "gross proceeds." The company received as a result of its mining operations $617,466.76. The mine seeks to deduct the costs of producing ore which nets the company $617,466.76 from the smelter returns of $125,-227.92 to obtain the net proceeds for tax purposes. Another illustration: The Hidden Treasure Mine, involved in this action, produced smelter returns of $144,693.74 and received premium payments of only $24,489.40 or gross receipts from its mining operations of $169,183.14, the costs of producing which would be deducted from $144,693.74. The mine does not give us the mining costs, but assuming they were equal per ton at the two mines, you would have the following anomalous figures: For every $169 received by the Hidden Treasure, it would be taxed on $144, while the Chief Consolidated for every $492 received would be taxed on $125. Computing over onto the same amount in dollars as tax base, for every $144 used in tax base and for which the Hidden Treasure received $189, the Chief Consolidated would receive $560.88. Certainly this would not be uniformity and equality in taxation.

On the other hand the method used by the Tax Commission tends to equalize and render uniform the tax base

and assessment. We find no valid constitutional objection, state or federal, to the computation of the tax base as used by the Tax Commission.

Judgment reversed. Costs to appellant.

McDONOUGH, WADE, and WOLFE, JJ., concur.

PRATT, Justice (dissenting).

I do not agree that a bonus, a premium, a subsidy—call it by any name—given as an inducement for extra production, is, in any sense, a measure of value, either of the article produced or of the unit that produced it. I am convinced the Legislature gave no consideration to such inducements in enacting the law in question.

Assume mine "A" produced in 1941 as its quota 300 tons of ore. For all over that amount produced in 1943 it received a higher price—why? Not that those particular excess tons were more valuable than the others—the excess tons were not earmarked in that way. The higher price for the excess was for the extension of the mine's facilities to greater production. The increase in price was consideration for production services, measured in price per pound of ore.

Value is the power an article itself confers upon its possessor to command, in exchange for itself, the labor or the product of labor of others. A prospective purchaser of mine "A" would not consider the willingness of the government to pay a premium for extra production an element of the value of the mine or of its ore. Rich ore available at low cost would not mature the purchaser's right to ceiling price plus subsidy. That right would mature only with specified production. The right is not contingent upon the kind of ore, but upon the amount of production. Production, not ore, is the foundation—the consideration for the premium.

What did the Legislature have in mind when it enacted the sections of our law in question? They were seeking a formula for establishing the commercial value of the mines.

An estimate of that value could not be made by merely looking at the mine—no one knew what was underground. They concluded that the best method of estimating that value was upon its ore value. Its ore value was evidenced by the proceeds of that ore. In effect they adopted this ore value as the unit of measure, and then established the formula for its use.

It may be that due to war conditions, ceiling prices, or other legal restrictions the true commercial value of that ore was not, as a practical matter, realized; but the formula did not change as a result. The Legislature was not thinking in terms of emergency conditions, and did not make any provision for expanding that formula to include income of a nature other than that of ore value—such as income from the rendition of extra production services.

In furtherance of the war effort the government expended vast sums for production. Many of the articles produced possessed little or no commercial value, although they were important war assets. One cannot reason from war expenditures to commercial values with any degree of accuracy or logic. I don't think the Legislature attempted any such reasoning.