COMBINED METALS REDUCTION CO. et al v. STATE TAX COMMISSION et al. (ten other cases).

Nos. 6869-6879. Decided January 6, 1947. (176 P. 2d 614.)

See 37 C. J. Licenses, Sec. 70; 47 Am. Jur. 218.

*Grover A. Giles,* Atty. Gen., *Zar E. Hayes* and *Arthur H. Nielsen,* Deputy Attys. Gen., *W. L. Skanchy* and *Wayne L. Christoffersen,* both of Salt Lake City, for appellants.

*Herbert Van Dam, Jr., Ingebretsen, Ray, Rawlins & Christensen, Cheney, Jensen, Marr & Wilkins* and *Farnsworth & Van Cott,* all of Salt Lake City, for respondents.

WADE, Justice.

Appeal by the State Tax Commission from judgments entered against it in favor of the mining companies, the respondents herein.

Each of the mining companies had filed a complaint against the Tax Commission to recover occupation taxes paid under protest for the year 1943. The issues in all the cases being the same they were consolidated for trial. The cases were submitted on written stipulations of the facts and the court's findings and conclusions were based on these stipulations.

During the course of this last war, our Federal government found it necessary in order to prevent hoarding, price spiraling, inflation and profiteering due to the great demands of the war upon our natural resources, to set up an Office of Price Administration, a Federal agency, whose duty it was to maintain price stability and prevent undue

price rises. This agency established certain maximum price schedules on commodities and it became unlawful to buy or sell any commodity above the "ceiling price" by the OPA.

In August of 1941, in pursuance of this policy, the OPA established a price schedule on metals. It soon became apparent that under this price schedule there would be an insufficient production of metals because a great many mining companies would not be able to operate at a profit and as a result our war effort would be hampered. In view of this and in order to facilitate the greatest possible production of copper, lead and zinc, the War Production Board and the OPA announced a "premium plan" whereby the Metals Reserve Company would pay a premium or bonus for the production of all copper, lead and zinc in excess of quotas which it would establish for each producer. Although the Metals Reserve Company was authorized to buy directly from producers at higher prices than those established by the OPA, none of the mining companies here involved sold its metals to it but sold to private industries at the maximum prices allowed by the OPA regulations and then received "premium payments" from the Metals Reserve Company under the "premium payment plan" for all metals which were produced in excess of the quotas assigned to each company respectively.

The State Tax Commission in making its assessments under the mining occupation tax statute which provides that mining companies must pay "an occupation tax equal to one per cent of the gross amount received for or the gross value of metalliferous ore sold" included the "premium payments" received by the respective mining companies from the Metals Reserve Company. The companies objected to this inclusion in the assessment and paid under protest that part of the tax which was based on these "premiums," and then filed suits in the district court to recover these taxes. The district court found in their favor.

Whether the "premium payments" made by the Metals Reserve Company for the production of metalliferous ores

in excess of quotas allocated to each company was properly included in determining the taxes due involves a construction of Sec. 80-5-66, U. C. A. 1943, which reads in part as follows:

"Except as herein otherwise specifically provided, every person engaged in the business of mining or producing ore containing gold, silver, copper, lead, iron, zinc or other valuable metal in this state shall pay to the state of Utah an occupation tax equal to one per cent of the gross amount received for or the gross value of metalliferous ore sold which tax shall be in addition to all other taxes provided by law * * *

"The basis for computing the occupation tax imposed by this act for any year shall be as follows:

"(a) If the ore or metals extracted is sold under a bona fide contract of sale the amount of money or its equivalent actually received by the owner, * * * operating the mine or mining claim from the sale of all ores or metals during the calendar year less a reasonable cost, if any, of transporting the ore from the place where mined to the place where, under the contract of sale, the ore is to be delivered.

"(b) If the extracted ore is treated at a mill, smelter or reduction works which receives ores from independent sources and which is owned or controlled by the same interests owning or controlling the mine or mining claim, such disposal shall be treated as a sale within the meaning of this section for the purpose of determining gross proceeds or otherwise, * * *."

Appellants contend the court erred in holding that the "premium payments" made by the Metals Reserve Company to the mining companies for production in excess of quotas allocated to each respectively were not properly included in determining the amount of the occupation taxes assessed, because the basic purpose of the statute is to levy an occupation tax "Equal to one per cent of the gross amount received for or the gross value of metalliferous ores sold" and these payments were part of the gross amounts received for ores sold. They argue that although the statute provides "yardsticks" or "measuring rods" by which this amount can be determined, that nevertheless, these yardsticks apply only to cases which come clearly within their scope. That the mining companies do not come within the scope of subsec. (a) which is the stand-

ard the mining companies contend should be used because all the metals produced, the value of which is involved in these cases, were sold to independent companies, because there could be no bona fide sales in view of the fact that the government controlled prices and distribution of products and there was no free, competitive market in which the mining companies could sell, nor were there purchasers who could buy without restraint. We cannot agree with this reasoning. Webster's New International Dictionary defines "bona fide" as being "in or with good faith; without fraud or deceit * * *." The mere fact that the conditions under which contracts of sale are made are regulated by a government does not mean that the contracts are not entered into in good faith and are not bona fide contracts of sale.

Appellants further contend that even though subsec. (a) should be considered the yardstick by which the commission must determine the taxes in these cases, nevertheless, the sale prices paid by the private industries under their contracts are not the sole criterion in fixing these taxes; that subsec. (a) should be so construed as to give effect to the intent of the act which is that the tax should be based on the gross amount received for or the gross value of the ores sold, and since subsec. (a) provides that the yardstick should be the money or its equivalent actually received by the owner from the sale, the "premium payments" were properly included because the mining companies actually received for the ores sold the "premium prices" as well as the purchase prices paid by the private industries under their contracts of sale.

We are of the opinion that if the "premium payments" made by the Metals Reserve Company were actually paid for ores sold that it was proper to include these payments in determining the assessments for the occupation taxes as the statute does not specifically limit the base to be used in such assessments to the *purchase prices* paid under bona fide contracts of sale but rather bases it on the amounts actually received where ore is sold under bona fide contracts of sale.

Respondents argue that the "premium payments" were not given for ores sold but were bonuses or subsidies given by the government to encourage the production of ores and did not affect the value of the ores, which value was ascertainable from the prices paid under the contracts of sale. Appellants urge that although the government was induced to make these premium payments because of the necessity of obtaining the greatest possible production of metals needed for the war effort and that the prices established by the OPA made it impractical to mine submarginal ores, that nevertheless, these premium payments were intended as further consideration for the metals sold, and they offer as proof of this the fact that the "premium prices" were included in the general price schedule fixed by the War Production Board, the Office of Price Administration and the Federal Loan Administrator, and also that it was considered necessary by these agencies to exempt these premium payments from the maximum price regulations established.

We are of the opinion that there is merit to appellants' contention. Although the "premium payment" plan was evolved for the purpose of making it possible to mine submarginal ores and to develop additional ore reserves and thus obtain production of urgently needed ores in our war effort, which production would not have been possible under the ceiling prices set for metals by the OPA, and although the mining companies could not get premium prices on all metals produced and sold by them, but only on those metals produced after the quotas which was allocated to each respectively had been fulfilled, nevertheless, the premium prices were paid only for such metals as were not only produced in accordance with the requirements of the plan, but which were also sold. This appears to us to be significant as indicating an intent on the part of the United States government to allow the payment of higher prices for certain metals sold and yet avoid a break in its program to avoid inflation. We base our conclusion that premium payments were made for ores sold and not for the mere production of

such ores upon part of a joint statement issued in February of 1942, by the War Production Board and the Office of Price Administration, wherein it is stated:

"Premium payments will be based upon metal *paid* for under the terms of settlement contracts. Quotas, of course, will be fixed on the same basis. If no settlement contracts exist, quotas and premium payments will be computed on the basis of 95, 90 and 85 per cent of the metal content in the case of copper, lead and zinc, respectively * * *." (Italics ours.)

It is self-evident that metals are not paid for under settlement contracts unless such metals are sold.

Since it appears that the "premium prices" paid to the mining companies are for metals sold by them, and since our occupation tax statute provides that the basis for determining the amount of taxes due where there has been a sale of metals under a bona fide contract of sale is

"The amount of money or its equivalent actually received * * * from the sale * * *."

It is our opinion that the lower court erred in holding that the "premium payments" received from the Metals Reserve Company should not have been included by the Tax Commission in determining the amounts due.

Reversed.

McDONOUGH, J., concurs.

WOLFE, Justice.

I concur in both the results and the reasoning of the main opinion. Because it is argued that "the amount of money actually received * * * from the sale of ores" is that which alone comes out of the pocket of the purchaser, I deem it helpful to supplement what has been said in the opinion by a further analysis.

It must be kept in mind that the tax imposed in this case is not one on the sale of ore or metal but one on the privilege of mining. The taxable event is the engaging in the occupa-

tion of mining. The fact that there is an exemption from the tax upon companies receiving less than $20,000 in gross value of ore does not make it less so. The very act was denominated "Mining Occupation Tax." The tax is imposed except as specifically otherwise provided on

"Every person engaged in the business of mining or producing ore," etc.

The remainder of the first paragraph of Sec. 80-5-66, U. C. A. 1943, deals with the measuring rod—to wit: a

"Tax equal to one per cent of the gross amount received for or the gross value of metalliferous ore sold," etc.

In view of the purpose to impose a tax on the privilege of engaging in the business of mining which business was the taxable event to which the tax was incident, I do not think it unreasonable to construe both the first paragraph and subparagraphs (a), (b) and (c) of the second paragraph of Sec. 80-5-66 as making the event of a bona fide sale during the calendar year the occasion which made the tax applicable, leaving still open the question of what amounts of money received for or on account or by reason or by virtue of the sale were to be the measure of the tax. That would make the payability of the tax depend on getting the ore produced in the channels of commerce. Thus we are not relieved from the necessity of determining whether the basis for computing the tax should or should not contain the moneys received under the "price-premium plan." I realize a good case can be made for excluding as well as including moneys received from that source but I think the conclusion arrived at by Mr. Justice Wade is more in accord with the realities of the situation than that of Mr. Chief Justice Larson and does no violence to the language of Sec. 80-5-66, U. C. A. 1943, and is in harmony with what I believe to be the intent of the legislature.

As to the realities: It is well known that the basic metals of copper, lead and zinc were indispensable to a successful prosecution of the war; that they were needed in great

quantities for that purpose; that the government was for all practical purposes the sole customer for these metals; that ceiling prices were necessary to resist inflation and thus prevent a great increase in the cost of war to the tax-payers; that if ceiling prices were alone resorted to for this purpose they would need to be placed at a point where the marginal high cost producer could continue to produce which would inordinately increase the profits of the low cost producer. A plan was, therefore, devised which would, in effect, give different prices to economically differently situated mines for the metal in their ores. And this was known as the "premium *price* plan." The very title of the plan is significant. Mines were to be paid different prices for their ores depending on the quotas assigned to them, which in turn depended on their production costs. The fact that part of the price came from the smelter and part from the government or all from the smelter if it used the authority it had to pay the premium price, the latter to be reimbursed for part of the expenditures, or all from the government as in the cases when the Metals Reserve Company bought the ores directly, would make no difference as to the *prices* received by the different mines. In many cases the higher cost mines were given zero quotas and were paid premium prices on all ores mined and placed into commerce, that is "sold"; and some of the zinc producers received even three different prices, being under "B" and "C" classifications and having an "A" quota of zero. In reality there was no free market and there were various premium prices paid for the same metals produced by mines economically differently situated. The fact that there was a ceiling plus the fact that all ores going to the smelters received these ceiling prices plus, in case they exceeded their quotas, additional or premium prices plus the fact that practically the entire output went to the government, made the real situation one where the smelters were in effect buying the ore from the mines for the government, paying ceiling prices for the metal content, the Metals Reserve Company adding a premium price where applicable. The smelters

were also reimbursed by the government for the ceiling prices which they paid to the mines in that the government in turn took the metal off their hands at the ceiling prices. The profits came to the smelters in the reduction charge made to the mines if it was smelted on a toll basis or, as in most cases, the reduction fee plus the percentage of metal taken as part of the smelter's remuneration if it were taken on a contract basis. But the price paid to the mines was in reality the ceiling price plus whatever premium price was applicable, if any.

That the so-called subsidy was in fact considered as an additional price for the metal in the ore is borne out by the fact that at first it was announced that the Metals Reserve Company would pay as an over all price the ceiling plus the premium prices for domestic ores where production exceeded quotas which were to be fixed. But under the Emergency Price Control Act the Metals Reserve Company could not sell for any more than the maximum price established. Hence, if the Metals Reserve Company had paid respectively 17¢ for copper, 11¢ for lead and 9¼¢ for zinc it would have been required to have them smelted on a toll basis and then sold to the fabricator for 12¢, 6½¢ and 8¼¢ per pound respectively for copper, lead and zinc. While the ultimate outlay to the government would have been substantially the same, it was simpler to have the mills or smelters pay only ceiling prices for the metals, the Metals Reserve Company paying the producer the premium price if applicable. But even this method required a change in the regulations of the Office of Price Administration in May, 1942. This was immediately after setting up the "premium price plan." The change in the regulation required sales of copper, lead, and zinc or ores containing such metals to smelters at ceiling prices but permitted Metals Reserve Company,

"pursuant to the premium price plan announced by the Federal Loan Agency, the War Production Board and the Office of Price Administration,"

to pay the premium price or subsidy and provided that it "should exempt from the maximum regulation." There should be little doubt, then, that the extra amount paid for metal in over quota ores is part of a price.

I do not think, as I shall point out below, that it makes any difference in the interpretation of Sec. 80-5-66 whether the amount paid by the Metals Reserve Company is called a premium price or a subsidy payment. In this part of my opinion I am attempting to meet the plaintiffs on their own ground, to wit: that moneys actually received from ore sold is the price or amount paid by the immediate purchaser, that is the mill or smelter. I am attempting to show that the price paid is a ceiling and a premium price even though they may directly come from two different sources. While reasons or motive for devising a plan or scheme ordinarily will not determine its legal nature, the reasons which actuated the plan may throw much light on the legal significance of the transactions or steps which are necessary for its working. Undoubtedly the reason for the Premium Price Plan was to keep the marginal mines in operation without material increase in ceiling prices. With our rapidly diminishing supply of known non-ferrous ores in place[1] it might

[1]"The known reserves of copper in this country that are at present commercially feasible to mine have been estimated to have a life of but 34 years if they are mined at a rate equal to the average 1935 to 1939 rate of use of copper. If one includes submarginal and highly speculative resources, an additional 5 to 25 years might be added to this figure. * * * It is well known that at the present time, lead is the most critical of the common non-ferrous metals and that the future of lead production in this country is not bright. It has been estimated that our commercial reserves, if they were mined at a rate equal to the 1935-1939 annual rate of use of lead, would last but 12 years. When submarginal and highly speculative resources are included, less than five years additional supply is available. Without question, the position of the United States with respect to lead is particularly, critical and needs full study to prevent any possible waste of our limited natural resources. * * * According to Pehrson, the commercial reserves of zinc, if mined at the average of our 1935-1939 annual rate of use, would last but 9 years. Taking into account known submarginal and highly speculative resources, another 5 to 25 years can be added." Report and Recommendations of the Nonferrous Metals Fact Finding Board, March 20, 1946—pages 13, 20 and 28.

be a wise policy of the government to subsidize marginal mines even in peace times at least to the point where production of going mines would not be abandoned because of cost. Abandonment of a mine may result not only in postponement of production to a later age but in absolute loss of the ore. If a premium price were given to conserve ores by getting them out of the ground in cases when abandonment and collapse of a mine permanently render their recovery impossible so as to stock pile them instead of getting them into commerce for present use, the motive might be somewhat different but legal nature of the transactions involved in the same plan as was in this case adopted would be the same.

The Intent of the Legislature:

Undoubtedly the legislature at the time of the passage of the Occupation Mining Tax Law (Chap. 101, Session Laws 1937, now Secs. 80-5-65 to 82, U. C. A. 1943) did not envisage a war, consequent price ceilings and premium prices. It intended to impose a tax on the privilege of mining ore and it made the measure of that tax a sum equal to one per cent of the gross amount received for or one per cent of the value of the metalliferous ore sold. It may and probably did have in mind that the measure of the value of the ore would be what was received directly from the smelter in a bona fide sale because it envisaged that as the usual situation in course of trade and did not think in terms of a consideration from another source. What was meant by a "bona fide sale" was a nonfictitious sale made on a free and open market. It probably had in mind and concluded that such receipts of such sale would measure the value of the ore, one percent of which value was to be the measure of the tax. But the language does not need to be so limited. It is a tenable position that the paramount intent of the legislature was, at all events, to have the tax measured by one per cent of all moneys *yielded* by the sale, the event of sale being the time when the measuring rod should be applied.

The strongest argument of respondents is that the construction of the act itself made one per cent of the amount of money actually received from a bona fide sale of the ores (less reasonable costs of transportation) the basis of the computation and that that must mean money received from the mill or smelter at ceiling prices without including the premium price. The answer is that the amount of money received for the ores are both the ceiling and premium prices, whether paid by the mill or smelter directly, subject to reimbursement from the Metals Reserve Company, or by the smelter and the Metals Reserve Company combined. The sale or delivery "for sale" to the mill or smelter is the occasion for the payment of the combination price. This is the occasion which gives assurance that the ore will not remain on the dump or in the stopes but will have made its entry into the channels of commerce. Under a fixed price the power of a commodity to command other commodities in exchange is not the same as on a free market. Value as meant by the legislature in Sec. 80-5-66 is no longer extant. The only remaining basis is the money received from the sale and certainly the money received from the sale is the total price which the sale yielded regardless of whether part of it would ultimately or immediately be paid by the Metals Reserve Company either directly or indirectly.

This conception comports with the overarching intent of the legislature and with the realities of the entire situation as previously set out. The manner which the government adopted for compensating the marginal or over quota producer for the mining and disposal of his ore, admitting the motive was increased incentive to produce, is not controlling. If the government had purchased all the ore directly and paid each producer directly the ceiling price and the premium price, if he were entitled to any, there would have been but little difficulty with the meaning of the word "sale" as used in the statute. By calling one part of the total amount received the sale price and other part a subsidy it cannot be made to appear that the latter part should be

excluded from what in reality, and I think in concept of law, is the total sale price.

I have above discussed the terms of the statute in the light of the proposition that the moneys paid by the Metals Reserve Company was in reality a part of a total price actually received by the owner or lessee from the sale of his ore albeit that total price may have come from two sources. But I would not want my views to rest on the narrow basis of what various parts of a total received were called. While in concept I think the whole can be conceived of in law as the price the sale yields, in final analysis I do not believe it makes much difference whether the part which the smelters pay is called a ceiling price and the other a premium price or a subsidy. After all we should look through terms to realities. As holds the main opinion in reality the

"Amount of money * * * actually received by the owner * * * from the sale of all ores or metals during the calendar year * * *"

was what those sales yielded and what they yielded was what was received from the mills or smelters or others to whom they were delivered plus what the Metals Reserve Company paid.

For the reasons contained in the main opinion as modified or augmented herein, I concur.

LARSON, Chief Justice.

I dissent. I think the judgment of the District Court was correct. As pointed out in the opinion, the statute imposes

"an occupation tax equal to 1% of the gross amount received for, or the gross value of metalliferous ore sold,"

and fixes the basis of computation as the amount of money actually received from the sale of ores or metals under a bona fide contract of sale, less transportation charges from the mine to delivery point; but in the event that the ore is treated at a mill, smelter or reduction works, owned by the

same interests as mines the ore's value shall be figured on the values such smelter or reduction works would pay for the ore or metal received by it from independent sources.

Are the premium payments made by the War Production Board included within this base? To me, it seems evident they are not included. In the first place, the premium payments are not money received for the ores or metals under a bona fide contract of sale.

Secondly, if the ore is milled, smelted, or reduced in a plant owned by the miner, which plant also treats independent ores, the value of the ores at the mill is the value for determining gross proceeds, the same as would be the value to the independent producer.

But the real question is: Is the premium payment an increase in the sale price of ore? It seems rather inconsistent to say the government would fix a sale of 12¢ for copper to some people and 17¢ to other parties under a program to insure equality or uniformity in prices. It hardly strikes sound to say the government was blackmarketing itself. Yet that seems to be what the situation would amount to. Let us note the statement of the War Production Board to which reference is made in the opinion and from which I shall quote more fully. The statement consists of Rules

"by which * * * mine operators may obtain premium prices for over quota *production,*" the "Purpose of the plan is to *expand the output* of" needed metals.

"Quotas will be fixed to include all output that can reasonably be expected at established market prices."

"Purpose of the premium plan is to *compensate* operators *for extra costs* involved in bringing out additional metal output."

"The premium payment plan has been established to make it possible quickly to *increase production by mining low grade sub-marginal ores,* and to *develop* additional reserves."

"The *only purpose* of the premium price plan is to *compensate* for extra costs involved *in bringing out* the *additional metal output.*"

"Should any mining property fail to maintain its quota production, premium payments will be made." (All italics are mine.)

I come now to the quoted statement in the opinion of Mr. Justice Wade:

"Premium payments will be based upon metal paid for under the terms of settlement contracts,"

which statement I think is misconstrued and misapplied. Settlement contracts are the contracts between the mine and the smelter. The quoted statement when read in connection with the whole declaration of which it is a part, does not justify the construction that premium payments are paid on ores sold. It simply gives the rule that computations for premium payments will be figured upon the basis of metal not only mined but actually turned into the channel of trade, so as to be available for the needs created by the war. In other words the mining operators cannot mine the ores, hold them and claim they have satisfied their quotas and had some overproduction for which they are entitled to premium payments. The metals will not be considered produced until turned into the channels of trade and manufacture. Computations therefore will be figured from the amount of metal bona fidely sold, and not upon the quantity mined. These payments are made only for the extra costs of bringing to trade the submarginal ores. It is somewhat analogous to the statutory provision deducing the cost of transporting the ores from the place where mined to the smelter. I think the premium payments are not within the contemplation of the statute included within the "amount received from the sale of ores under bona fide contracts of sale." I therefore dissent.

PRATT, J., not participating.