KENNECOTT COPPER CORPORATION v. STATE
TAX COMMISSION, and four other cases.

Nos. 7297, 7323, 7324, 7332, 7334.

Decided November 30, 1949. (212 P. 2d 187.)

Rehearing Denied March 14, 1950.

See 53 C. J. S., Licenses, sec. 48. Taxation base, as to minerals, see note, 16 A. L. R. 513. See, also, 51 Am. Jur. 452.

*Calvin A. Behle,* Salt Lake City, *C. C. Parson,* Salt Lake City, *William M. McCrea,* Salt Lake City, *A. D. Moffat,* Salt Lake City, *R. J. Hogan,* Salt Lake City, *Cheney, Marr, Wilkins & Cannon,* Salt Lake City, *Ingerbretsen, Ray, Rawlins & Jones,* Salt Lake City, for appellant Kennecott Copper Corporation.

*Cheney, Marr, Wilkins & Cannon,* Salt Lake City, *Dickson, Ellis, Parsons & McCrea,* Salt Lake City, *Ingebretsen, Ray, Rawlins & Jones,* Salt Lake City, *R. J. Hogan,* Salt Lake City, for appellants Chief Consolidated Min. Co., United States Smelting, Refining & Mining Co., Silver King Coalition Min. Co. and Park Utah Consol. Min. Co.

*Clinton D. Vernon,* Atty. Gen., *Zar E. Hayes,* Sp. Asst. Atty. Gen., *J. Lambert Gibson,* Deputy Atty. Gen., for respondent State Tax Commission.

*Clinton D. Vernon,* Atty. Gen., *Zar E. Hayes,* Sp. Asst. Atty. Gen., *J. Lambert Gibson,* Deputy Atty. Gen., *Edward M. Morrissey,* County Atty., Salt Lake City, for respondent Salt Lake County.

*Clinton D. Vernon,* Atty. Gen., *Zar E. Hayes,* Sp. Asst. Atty. Gen., *J. Lambert Gibson,* Deputy Atty. Gen., *P. H. Neeley,* County Atty., Coalville, for respondent Summit County and others.

LATIMER, Justice.

Although separate appeals have been filed in the five cases involved, by stipulation of the parties, they were consolidated for presentation to this court. In each case, certain taxes levied by the State Tax Commission were paid under protest by the respective mining companies and an action commenced in the District Court to recover the taxes

so paid. A general demurrer was filed in each action by the appropriate defendant agency and these demurrers were sustained by the lower court. Upon plaintiffs' refusing to further plead an order of dismissal was entered and these appeals followed. Our decision on the one principal question involved makes it possible to dispose of all cases by this one opinion.

According to the allegations of the complaints filed by three appellants—Kennecott Copper Corporation, Chief Consolidated Mining Company and Silver King Coalition Mines Company—the State Tax Commission wrongfully included in each company's "mining occupation" tax base for the years 1944 and 1945 certain sums of money each had received as subsidies from the Federal Government. Those subsidy payments were used in computing the individual mining occupation tax that each company was required to pay under and by virtue of Section 80-5-66, U. C. A. 1943. The portions of that statute involved provides as follows:

"Except as herein otherwise specifically provided, every person engaged in the business of mining or producing ore containing gold, silver, copper, lead, iron, zinc or other valuable metal in this state shall pay to the state of Utah *an occupation tax equal to one per cent of the gross amount received for or the gross value of metalliferous ore sold* which tax shall be in addition to all other taxes provided by law.   *   *   *

"The basis for computing the occupation tax imposed by this act for any year shall be as follows:

"(a) If the ore or metals extracted *is sold under a bona fide contract of sale the amount of money or its equivalent actually received by the owner, lessee, contractor or other person operating the mine or mining claim from the sale of all ores or metals during the calendar year* less a reasonable cost, if any, of transporting the ore from the place where mined to the place where, under the contract of sale, the ore is to be delivered.

"(b) If the extracted ore is treated at a mill, smelter or reduction works which receives ores from independent sources and which is owned or controlled by the same interests owning or controlling the mine or mining claim, *such disposal shall be treated as a sale within the meaning of this section for the purpose of determining gross*

*proceeds or otherwise,* and in such determination a rate or charge for sampling, assaying, milling and smelting the ores and extracting the metals and minerals therefrom shall be deducted which shall not exceed an amount to be determined by applying the same rates as are applied by such mill, smelter, or reduction works or competing works, to ores of substantially like character and in like quantities received from independent sources. * * *" (Italics added.)

According to the allegations of the complaints filed by the other two appellants, United States Smelting Refining & Mining Company and the Park Utah Consolidated Mines Company, the respective counties, in a like manner, wrongfully included in the "net annual proceeds" tax base for 1944 and 1945 the amount of Federal subsidies each company had received during those years. The statute controlling the manner of determining the net proceed tax is Section 80-5-56, U. C. A. 1943, and it in part provides:

"All metalliferous mines and mining claims, both placer and rock in place, shall be assessed at $5 per acre and in addition thereto at a value equal to two times the net annual proceeds thereof for the calendar year next preceding. * * *" .

So far as material here, the term "net annual proceeds" is defined in the next succeeding Section 80-5-57 U. C. A. 1943, as follows:

"The words, 'net annual proceeds,' of a metalliferous mine or mining claim are defined to be the *gross proceeds realized during the preceding calendar year from the sale of or conversion into money or its equivalent of all ores* from such mine or mining claim extracted by the owner or lessee, contractor or other person working upon or operating the property, including all dumps and tailings, during or previous to the year for which the assessment is made, less the following, and no other, deductions: * * *." (Italics added.)

While there are two separate and distinct taxes involved there is only one important question to be determined on this appeal, viz. Were the Federal payments properly included in the tax base for the purpose of determining the "net proceeds tax" and the "mine occupation tax?" If so, the taxes in dispute were properly levied. If not, the trial

court erred in sustaining the demurrers filed against the various complaints.

The State Tax Commission and the respective counties defend the inclusion of the subsidy payments in the "net proceeds" formulae on the grounds that monies received during the years in question were part of the

"gross proceeds realized * * * from the sale of or conversion into money or its equivalent of all ores"

mined, and the inclusion of the subsidy payments in the "occupation tax" formulae on the ground that the monies received were from ore or metals sold under a bona fide contract.

In 1941, the President of the United States promulgated an executive order by which there was established an Office of Price Administration. Executive Order April 11, 1941, No. 8734. One of the duties of the Administrator was to fix maximum prices of materials and commodities including the price of metals. In the same year, maximum prices upon the metals mined by the various appellants were fixed by the Price Administrator. The following year, Congress, by statute, 50 U. S. C. A. Appendix, § 902(e), empowered the Administrator to secure maximum production of any commodity essential to the successful prosecution of the war. To achieve this result, the Act empowered the Administrator to authorize payment of subsidies to domestic producers of any essential metals in such manner and upon such terms and conditions as he should determine to be necessary to secure the desired production. Under the statute subsidy payments could only be paid by those corporations created and organized pursuant to Section 5d of the Reconstruction Finance Corporation Act, 48 Stat. 1108. Metals Reserve Company, a statutory subsidiary of Reconstruction Finance Corporation, was the authorized Federal Agency empowered to make such subsidy payments as the Administrator should determine were to be paid. In the same year, 1942, the Administrator, in cooperation with

the War Production Board found that costs of mining and producing the desired metals were too high to permit maximum production in view of the then established ceiling prices, and, that a subsidy payment would be necessary to compensate the producing companies for the increased costs of producing ores. It was therefore determined by the Administrator that producers of essential metals including those involved in these appeals should be paid premiums for metal production over and above their fixed production quotas.

The operation of the three appellants—Park Utah Consolidated Mines Company, Silver King Coalition Mines Company and Chief Consolidated Mining Company—consisted of producing ore to be sold to mills or smelters. The Metals Reserve Company designated the purchasing mills and smelters its agents for the purpose of dealing with these three companies. The mills or smelters were required to procure affidavits from each company as to eligible ores produced and available for the payment of subsdies and to verify the information contained in the affidavits. Metals Reserve Company furnished these agents with funds sufficient to pay the subsidies found to be due and owing on the basis of the verified affidavits. While the mill or smelter paid both the purchase price and the subsidy, when the companies submitted their returns to the State Tax Commission for taxation purposes, they reported the ceiling price payment they had received from the mills and smelters for the ore but excluded the amounts of money they received as premium payments for over-quota production.

The appellant, United States Smelting Refining & Mining Company processed its ores and received Federal subsidies for over-quota production computed upon the basis of the metal content of its ores determined by sampling and assaying before any processing except crushing took place. In some instances, these subsidy payments were received thirty to ninety days before any metals had been recovered from the ores.

Appellant, Kennecott Copper Corporation, mined and milled its own ores, shipped its mill concentrates to independent smelting and refining companies on a contract or toll basis for refining and marketed its own refined copper after it had been processed and returned. It received premium or subsidy payments for over-quota production, based upon monthly affidavits showing the company's production of "returnable" copper, computed on ninety-seven per cent of the copper contained in the company's mill concentrates as determined from assayed samples of its ores.

Both United States Refining & Mining Company and Kennecott Corporation reported to the State Tax Commission the ceiling price of metals as the amount upon which the mining occupation tax or a net annual proceeds tax, as the case may be, was owing and excluded from their reports the money received from the Federal Government as premium or subsidy payments.

The principal issue upon which the parties come to grips is whether the recent cases of *Combined Metals Reduction Co. et al.* v. *State Tax Commission,* 111 Utah 156, 176 P. 2d 614 and *United States Smelting, Refining & Mining Company* v. *Haynes,* 111 Utah 172, 176 P. 2d 622, are decisive of the instant case. The facts in those cases are much the same as the one before us now. In the first cited case, the question to be determined was whether the Tax Commission properly included monies received by mining companies (including some of these appellants) in the form of Federal subsidies in computing each company's mining occupation tax. The subsidy payments involved in that case were paid for the same purpose as those paid in these cases. Counsel for the mining companies there argued that the subsidies were not monies derived from the sale of ores within the meaning of Section 80-5-66, U. C. A. 1943, supra, but rather were bonuses given by the Federal Government to encourage production of ore. In analyzing the Federal regulations which were called to our attention we noted that the regulations prescribed that premium pay-

ments would be based upon metal paid for under the terms of settlement contract. We concluded that by making the sale of ore the incident authorizing payment of premiums, the Federal Government thereby intended to add to or supplement the contract price for certain essential metals to keep needed production high and at the same time avoid inflationary tendencies incident to uncontrolled prices. Thus, we held that premiums paid were in reality part of the price derived from the sale of ore or metal and that the Tax Commission properly included these premium prices in computing the mining occupation taxes.

In the second case cited, referred to for convenience as the Haynes case, we were required to decide whether similar premium or subsidy payments received for over-quota production should be considered part of the "gross proceeds realized from the sale or conversion of ores" as provided for in those portions of Section 80-5-56, U. C. A. 1943, dealing with the net annual proceeds tax. We held that our earlier decision in *Combined Metals Reduction Co. et al.* v. *State Tax Commission*, supra, was controlling in those instances where sales had been consummated and that in other instances where the ores had been reduced to concentrates but had not yet been sold, the premium payments were part of the value realized from conversion into money or its equivalent and were properly included in the tax base from which a net annual proceeds tax should be computed.

Appellants in the case at bar contend that the Federal regulation upon which the parties and this court relied in the two earlier cases has been rescinded and a new rule promulgated which presents new and different issues and requires different holdings by this court. The regulation quoted from in the previous case of *Combined Metals* was published by WPB-OPA quota committee and is identified as rule 13. It provides as follows:

"Premium payments will be based upon metal paid for under the terms of settlement contracts. Quotas, of course, will be fixed on the same basis. If no settlement contracts exist, quotas and premium

payments will be computed on the basis of 95% 90% and 85% of the metal content in the case of copper, lead and zinc, respectively. Ores from mines from integrated companies will be treated in the same manner."

The new or amended regulation referred to by appellants is still identified as rule 13 and it in part provides:

"Monthly production quotas, and monthly production for determining the amount of over-quota production on which premium metal payments are made, will be based on the following percentages for the respective metals, regardless of the percentages of the metals actually recovered or paid for under mine-smelter contracts or mill-smelter contracts, or mine-mill contracts:   *   *   *."

Appellants are essentially correct in their contention that the decision in the former cases of *Combined Metals Co. et al.* v. *State Tax Commission,* supra, was influenced by the original wording of rule 13. We quote from the majority opinion [111 Utah 156, 176 P. 2d 617]:

"*   *   * We base our conclusion that premium payments were made for ores sold and not for the mere production of such ores upon part of a joint statement issued in February of 1942, by the War Production Board and the Office of Price Administration, wherein it is stated: 'Premium payments will be based upon metal *paid* for under the terms of settlement contracts. Quotas, of course, will be fixed on the same basis. If no settlement contracts exist, quotas and premium payments will be computed on the basis of 95, 90 and 85 per cent of the metal content in the case of copper, lead and zinc, respectively   *   *   *."

"It is self-evident that metals are not paid for under settlement contracts unless such metals are sold."

However, the language used in *United States Smelting Refining & Mining Company* v. *Haynes,* supra, broadened the scope of the former as the later decision holds that, for "net proceed tax" purposes, there need not be a sale of the metals to include the subsidy payment in the tax base. The following statement is found on page 178 of 111 Utah, on page 625 of 176 P. 2d:

"*   *   * But if the fact be that these ores or metals extracted therefrom were or have been sold, then under our decision in *Com-*

*bined Metals Reduction Co.* v. *State Tax Commission* [111] Utah [156], 176 P. 2d 614, these payments would constitute part of the proceds received from a sale, and properly be a part of the gross proceeds realized. The writer dissented from the opinion in that case and expressed his views therein. However, while that opinion stands it binds the writer, as well as the bar and laymen, and I accept it as the law of this jurisdiction. *It follows that whether the metals have been sold or retained by the miner, the premium payments are part of the gross proceeds, realized from ores extracted from the mine, and are to be included in computing the tax base or valuation of the mine for tax purposes."*

We could play with words, get down to fine niceties and by strict construction of phrases differentiate the present cases from those previously decided. More than that, there might be some slight difference between the methods used in disposing of the ore by the individual appellants, or the time each received payment, which would permit the inclusion of some premium payments to be sustained and the others invalidated. However, if we cast aside tenuous arguments and face the actualities of the situation now confronting us, we must either overrule the former decisions or we must affirm the trial court in these actions.

While the writer of this opinion was not a member of the court when the previous decisions were rendered, it is conclusive from the opinions of the members of the court as then constituted that they believed a good case could be made for including a premium payment in the tax base and conversely that a good case could be made for excluding the payments. Out of those two possibilities, the court chose to include the premiums. The claimed errors in the former decisions were pointed out and emphasized in detail in the briefs on the petitions for rehearing and the contentions advanced were considered and overruled. Accordingly, if the facts in the present cases are on all fours with those of the previous cases, and the former decisions are not injudicious or clearly erroneous, the doctrine of stare decisis should be adopted.

Appellants must concede that the over-arching purposes of the plan were not changed or varied over the years involved. It largely remained as it was conceived. If the original plan could be interpreted as a supplemental purchase price plan it was not changed. The plan had its origin in the efforts of the Federal Government to maintain and expand production of copper, lead and zinc, and to maintain price stability in those strategic metals. It was conceived and operated for a dual purpose and no one can say which aim was paramount. Both, however, were important. There is set forth in the brief of appellants a statement prepared by the History Branch and Office of Metal and Mine Analysis of the Office of Price Administration which shows why it is not so unreasonable to tie the maximum price and subsidy payments together to obtain the true sale price of the metals. We quote from that article:

> "*The premium price plan was one* of the most successful of these techniques and *involved the payment by the Government of premiums for all production of copper, lead, and zinc above quotas established generally on the basis of 1941 output. The payment of a small subsidy as an alternative to raising the general level of metal prices saved the Government, as a large purchaser of metal war materials, many millions of dollars* and aided in the stabilization of the prices of many metal products. \* \* \*." (Italics added.)

Standing alone a subsidy payment might not bear any relationship to a sale price plan but once we tie the subsidy payment in with ceiling prices, we have a reasonable basis for our previous holding that the maximum price permitted by the OPA and paid by the purchaser plus a premium payment by the government constituted the true sales price of the metal regardless of the fact that payments came from two separate sources. The Federal Government could have permitted a general price increase with the same result but it chose the alternative plan and paid the difference between the ceiling price and the premium price. It may be, as contended for by appellants, that different times of payment argue for holding that the plan was not a price plan but

rather a development plan. But there are other factors which caused this court to conclude otherwise.

Appellants rely largely on a claimed change in rule 13. There was a change in the wording of the rule but even were we to concede that the modifications made a change in substance, we would be faced with the situation that the amended rule was in force and effect as early as December, 1942. This was some two years before the taxes were paid and four years before our previous decision. The opinion in *Combined Metals Company et al.* v. *State Tax Commission,* supra, does not refer to the amended rule, but reading of the briefs and a review of the records in that case points so clearly to its being considered that little is left to the imagination. Appellants presently contend that the modified rule permits payment of the premiums without regard to settlement contracts. This same question was briefed and presented in the *Combined Metals* case and in *United States Smelting Refining & Mining Co.* v. *Haynes,* supra, Mr. Justice Larson, writer of the principal opinion, in discussing the tax points out that the premium payment can be included in the tax base even though the ore remains with the miner. Appellants also contend, in keeping with the new rule that premiums were paid to Park Utah to permit it to unwater the Ontario shaft, which they claim indicates the payments could not be tied in with the contract of sale. The same illustration and same argument was presented to the court in the earlier cases. Appellant, Kennecott Copper Corporation, asserts that premiums are paid to it before there has been brought into existence a commercial product that was capable of sale. There was no change in this method of procedure during the years here involved and this matter was previously presented in the brief of amicus curiae in the earlier cases. Other similarities could be mentioned but the foregoing are sufficient to show that amended rule 13 was the foundation for many of the arguments of appellants in the previous cases, and that the principal contentions now made were thoroughly argued in the previous presentations. The arguments were not persuasive

then, and having once overruled these contentions, it is not considered advisable to reverse ourselves and follow a course we thought not the best.

As previously indicated it is possible to play with words by asserting that the issues now presented are substantially different than was previously presented because of a change in rule 13. In considering whether the issues are different, it is to be borne in mind that these are subsequent and separate actions between the parties and the true test is whether the same points or questions are being relitigated. We have no desire to foreclose appellants from presenting matters which were not litigated in the previous cases. The only burden we place on them is to establish that the matters presented in these suits are essentially and substantially different from those passed on in the previous litigation. We realize that various considerations may govern a person in the presentation of points in one action which may not exist in another action upon a different demand. Granting to appellants the right to insist on a consideration of all points not raised in the previous action, we are unable to determine any new points or questions now being advanced which were not presented to us for consideration in the earlier actions, with the possible exception of the fact that the subsidies continued for some period after the ceiling price on the metals was removed. This one additional factor is not of controlling importance. Undoubtedly, for each year the premium payments were included in the tax base appellants will feel they were subjected to hardships, and ought to have another chance to establish their cause. But this hardly justifies a vacillating policy of holding the premiums to be legally included for one year and illegally for another.

There are other cogent reasons why we should reaffirm our decisions in the previous cases. Federal Courts have been required to adopt our previous constructions. After our decisions in those cases, the United States Court of Appeals, Tenth Circuit, in the case of *Salt Lake County* v.

*Kennecott Copper Corporation,* 163 F. 2d 484, 487, held that the interpretation of our laws was a prerogative belonging to this court and that having construed the statute to require the inclusion of the premium payments, our structon was binding on that court. Circuit Judge Bratton, speaking for the court, said:

"One ground of the motion for directed verdicts for plaintiffs was that in the taxation of the mines and mining claims, the inclusion of subsidy payments in the gross proceeds and thence in the net proceeds, as a basis for such taxation, was not authorized by the law of Utah. That question consumes much space in the briefs and it was ably presented on oral argument. The Supreme Court of Utah quite recently considered the question and held without qualification that in the taxation of mines and mining claims in that state, premium or subsidy payments of this kind should be added to twice the amount of the proceeds received from the sale of the ores for the preceding calendar year as the base for such taxation. *United States Smelting, Refining & Mining Co.* v. *Haynes,* Utah [111 Utah 172], 176 P. 2d 622. And at the same time, the court reached a like conclusion in a case involving a closely similar question. *Combined Metals Reduction Co.* v. *State Tax Commission* [111] Utah [156], 176 P. 2d 614. The question before us is essentially one of local law and therefore these decisions of the supreme court of the state are controlling."

Within the last six months the same United States Court of Appeals in the case of *Nevada Half Moon Mining Co.* v. *Combined Metals Reduction Co.,* 10 Cir., 176 F. 2d 73, 75, held that the subsidy or premium payments paid by the Metals Reserve Company to the Combined Metals Reduction Company were to be included as part of the net mill or smelter returns. In that case, the Combined Metals Reduction Company agreed to pay Nevada Half Moon Mining Company two and one-half per cent of the net mill or smelter returns received from the sale or disposal of the ore mined and produced from any of the property. The contract defined smelter returns as

"the net amount paid for the ores by the mining or smelting company to whom they were sold after deducting all charges for treatment, transportation, sampling and assaying."

The court again cites our previous holdings and states in the following language the reasons for holding that the percentage applied to the premium payments:

"The contract did not make express reference to the premium or subsidy payments subsequently made by Metals Reserve Company to Combined as a means of encouraging increased production of metals from the property. In the very nature of things that was not done because at the time of the execution of the contract it was not anticipated or foreseen even remotely that payments of that kind would in later years be made to the producers of metals. *But the sums which Metals Reserve Company paid to Combined accrued to the latter as the proximate result of the production and processing of ores extracted from the premises as much as though they had been received from the purchaser of the ores. Viewed in that manner, such sums were the equivalent of returns for the ores within the scope of the contract.* Cf. *Combined Metals Reduction Co.* v. *State Tax Commission* [111] Utah [156], 176 P. 2d 614; *United States Smelting, Refining & Mining Co.* v. *Haynes* [111] Utah [172], 176 P. 2d 622; *Salt Lake County* v. *Kennecott Copper Corp.*, 10 Cir., 163 F. 2d 484, certiorari denied, 333 U. S. 832, 68 S. Ct. 458, 92 L. Ed. 1116. And inasmuch as they were the equivalent of returns from the production and processing of ores extracted from the premises within the scope of the contract, Combined was liable to Nevada for payment of the royalty thereon." (Italics added.)

There being no substantial difference between the present cases and those earlier decided by us, we are satisfied that the conclusions previously reached were not erroneous and that even though appellants again make a good case for their side of the dispute, the original interpretation and these judgments should be affirmed.

WADE, WOLFE and McDONOUGH, JJ., concur.

PRATT, Chief Justice (concurring).

I concur in view of the fact that the views I have heretofore expressed upon cases such as this, were in the minority.