CONSOLIDATED COPPERMINES CORPORATION, A CORPORATION, APPELLANT, v. S T A T E  O F NEVADA, THE COUNTY OF WHITE PINE, AND  THE  NEVADA  TAX  COMMISSION, RESPONDENTS.

No. 3625

May 11, 1951.                                    231 P.2d 197.

*Woodburn, Forman and Woodburn,* of Reno, for Appellant.

*W. T. Mathews,* Attorney General, *Alan Bible, George P. Annand, Robert L. McDonald, Thomas A. Foley,* Deputy Attorneys General, of Carson City, and *C. J. McFadden,* of Ely, Attorneys for Respondents.

## OPINION

By the Court, MERRILL, J.:

This is an appeal from judgment of the trial court dismissing the complaint of appellant in an action brought by it to recover the sum of $18,175.83 taxes paid under protest. The sole question involved in the appeal is whether government premium payments made to appellant in addition to sums received by it for sale of its ore, can properly be regarded as mine proceeds and therefore subject to tax under the revenue laws of this state. The appeal comes to us upon a stipulated statement of facts.

During the first six months of 1945 appellant extracted from its mining properties in White Pine County, Nevada, 1,041,759 tons of ore containing gold, silver and copper. From this ore, after smelting and refining, appellant received through sales in ordinary commercial channels the sum of $2,510,834.05. This sum plus the sum of $606.71 received in royalties, was duly reported to the Nevada Tax Commission as gross yield of the

mine for the period in question. Appellant also reported to the commission as proper deductions from its gross yield the sum of $2,712,057.65, thus making return that its deductions exceeded its gross yield and that it had accordingly received no net proceeds from its mine during this period for which tax might be imposed.

During the period in question a ceiling price of 12 cents per pound of copper had been imposed by the Federal Office of Price Administration and the proceeds of appellant's sales of copper had been limited accordingly.

In addition to the gross yield reported by it, appellant had also received for its production during this period the sum of $862,162.75 paid to it by Metals Reserve Company, a statutory subsidiary of Reconstruction Finance Corporation. These payments had been made pursuant to the terms of a federal program inaugurated jointly by the War Production Board and the Office of Price Administration and known as "Premium Price Plan for Copper, Lead and Zinc." Under the plan a quota (in the main based upon 1941 copper production with consideration given to cost of production) was fixed by Metals Reserve Company for each copper producing mine. For all production in excess of the quota Metals Reserve Company paid the sum of 5 cents per pound. The sum received by appellant from Metals Reserve Company therefore reflected the sum of 5 cents per pound for overquota copper produced by it during this period.

The tax commission insisted that these payments be included as part of the mine's gross yield and upon such addition levied its tax of $18,175.83. This amount was paid by appellant under written protest and this action was duly brought for its recovery.

There is no dispute as to the nature of the tax as provided by our revenue act. It is recognized by all parties that the tax is an ad valorem tax rather than an income tax or occupation license; that the tax is not upon the mine itself nor upon the mining enterprise but is solely

upon the proceeds of the mine. The dispute before us is as to the character of the sums provided by Metals Reserve Company. It is contended by respondents that these sums constitute mine proceeds. It is contended by appellant that they do not. Authority upon the proposition is limited to decisions of the courts of two western states, Montana and Utah. The authority is cleanly divided, Montana supporting the position of appellant and Utah that of respondents. In this opinion we follow the views of the Utah court.

In support of its position appellant points out that the net proceeds tax is a tax upon the value of ore or its product; that the sale price is recognized as the primary measuring rod in determination of value; that the sales here involved were made through ordinary commercial channels and the price received was 12 cents a pound; that no sales were made to Metals Reserve Company; that the premium payments, accordingly, came from a source entirely independent of the sale itself. Appellant therefore concludes that the premium payments here involved had no relation to the value of the ore and were not part of any sale price; that while they may have constituted income of the enterprise, this must be recognized as a factor entirely apart from the value of the proceeds themselves.

Klies v. Linnane, 117 Mont. 59, 156 P.2d 183, 185, supports and illustrates appellant's position. There it is stated:

"Production not otherwise practicable may artificially be made so, either by increasing the price of the product, or by rewarding the production otherwise, as by subsidy or bonus payment. An essential difference between the two methods is that a direct price increase ordinarily not only rewards and thus encourages additional production, but also makes more profitable the production which would have existed without it; on the other hand, the subsidy or bonus method can more practicably be limited in application to the additional production.

Either method would tend to increase the production of strategic metals for war purposes by making profitable an enterprise which otherwise could not pay its way, and, therefore, could not operate. Both methods increase the proceeds and therefore the value of the enterprise by making it profitable, but only the price rise method increases the value of the product. Thus they are similar only in increasing the income from, and the value of, the enterprise.

"* * * But the tax upon the net proceeds of mines is not based upon the value of the enterprise, nor upon all possible income therefrom. It is based only upon the net value of the ores produced. Income in addition to that received as the net value of the product may perhaps be taxable as income, but it is clearly not taxable as 'net proceeds of mines' * * *.

"* * * The value, however fixed, is the price paid and received for the metal, and other rewards, incentives or incidental income are not part of that value; they are therefore not part of the tax base."

For an independent analysis of the character of the premium payments we turn to the plan itself and to the circumstances and conditions which determined its ultimate form. See: Seventy-ninth Congress, Second Session, Senate Subcommittee Print Number 8, "Premium Price Plan for Copper, Lead and Zinc; Its Administration With Particular Regard to Small and Marginal Mines" (which bulletin forms a part of the stipulated facts in this case). Page references following are to pages of this bulletin.

Following the outbreak of war in Europe, American metal markets were unstable, with sharply fluctuating prices. Copper advanced from 10½ cents in July, 1940, to 12 cents in September. In April, 1941, a 12-cent ceiling was fixed. Military requirements were growing steadily and the necessity for maximum expansion of domestic production was indicated. Increased production automatically resulted in rapidly increasing costs as it became necessary to resort to lower-grade ores and

more costly mining. By the end of the year it had become clear that domestic production could not be increased to the necessary extent "without establishing price scales that would make profitable the mining of marginal ores." (Page 42.)

To this end various plans received consideration by federal stabilization and production officials and some were actually placed in temporary operation. Alternative proposals included a general raising of the 12-cent ceiling and direct government purchase at a price of one cent plus out-of-pocket costs. The latter method was actually applied for a short period in the case of certain Michigan mines. General ceiling raises, however, were rejected on the basis of experience gained during World War I when such practices had resulted in copper reaching a level of 26 cents a pound, almost double the 1914 price. A "two-price" plan was first proposed August 4, 1941.

With the entry of the United States into war following the attack on Pearl Harbor, the Office of Price Administration was ready to accept the two-price system applicable to lead and zinc. Copper was not at first included, the feeling apparently being that the cost-plus arrangement was adequate to meet the circumstances. The original plan for lead and zinc provided for government purchase of overquota production under a differential price arrangement. This was to be accomplished by having Metals Reserve Company purchase all incremental production and resell it at the ceiling price, absorbing the loss.

In January, 1942, copper was included in the plan. Federal Loan Administrator Jesse Jones advised O.P.A. under date of January 12, 1942, "You are advised that, in accordance with your suggestion, Metals Reserve Company will, at your request, for a period of $2\frac{1}{2}$ years from February 1, 1942, pay * * * 17 cents per pound, Connecticut Valley, for copper, for increases above 1941 production governed by quotas to be fixed by you with our approval. * * * Any metals so acquired by Metals

Reserve Company which are not used for or by the Government will be subject to your allocation at the ceiling price fixed by the Price Administrator * * *." (Page 44.) On January 13 the program was explained to the public through a press release which contained this statement: "All the overquota output acquired by the Metals Reserve Company will be used for, or by, the Government or will be sold, subject to Government allocation, at the regular Office of Price Administration ceiling prices. All quota production must, of course, be sold by producers at or below the Office of Price Administration ceiling prices. Hence the premium-price program to stimulate additional production will not lead to higher prices to the consumer." (Page 217.)

By February 1, however, details of the plan still remained to be worked out and the feature of direct government purchase, therefore, was not yet feasible. To avoid delay in the plan's operation, arrangements were made to proceed temporarily without application of that feature. A press release advised: "Further details of this plan will be announced in due course. In the meantime all producers should continue to sell their output through regular channels in the ordinary way, but should keep all data covering production, sales, and settlements so as to be in a position to make out the affidavit which will be required of them. If, at any time, any producer has thus sold his excess output at ordinary market prices, he will not thereby be deprived of the benefits of this arrangement, since in such cases an equivalent quantity of material will be eligible for sale, at the higher prices, from subsequent deliveries." (Page 218.)

Up to this date it was apparent that the plan contemplated actual sale to the government of the overquota output at the higher or premium price. Sale of overquota output through regular channels was merely a stopgap procedure adopted to permit immediate operation of the plan.

On February 9, 1942, the terms of the plan itself were

announced and for the first time it was indicated that sales of overquota output were to be made through commercial channels as a regular feature of the plan. It can only be concluded that in the interests of time and convenience, an unnecessary procedural change was regarded as unwise. The statement of the plan included the following language: "Premium prices of 17 cents for copper  *  *  *  will be paid for a period of $2\frac{1}{2}$ years beginning February 1, 1942  *  *  *." The purpose of the plan and the reason for its necessity were clearly stated: "The only purpose of the premium-price plan is to compensate for extra costs involved in bringing out additional metal output." (Page 220.)

It is notable that the term "price" is used consistently throughout government releases and correspondence on the subject. The government was seeking a "price scale" which would make profitable the mining of marginal ores; the 17-cent total payment was a "premium price"; the plan was a "two-price plan"; the method or technique utilized was "differential pricing."

Upon consideration of this factual background we find the conclusion inescapable that the premium payments made by Metals Reserve Company were in character a part of the price paid for the ore produced and did not constitute an incentive reward unrelated to price or value.

This is supported by the fact that under the various alternative plans considered and ultimately rejected there could have been no question but that the sum received was the sale price. For example, had the government accomplished its end by a general raising of the price ceiling there would, in lieu of the premium payment here involved, have been a higher price through ordinary commercial channels. Had the government continued with the cost-plus arrangement applied to the Michigan mines there would have been no question but that the sums paid were the sale price of the ore itself. Under the "premium price plan" itself, as originally conceived and announced with direct government

purchase of overquota production, there could have been no question but that the premium was part of the price paid. Even without the feature of direct government purchase the government clearly regarded the 17 cents, being the sum of the ceiling price and the premium payment, as itself constituting a price: the "premium price" from which the plan derived its name.

It should be noted as well that under the 12-cent ceiling there was no free and open market in which the true value of the product could be ascertained. The sale price was artificially fixed and artificially supplemented. Had it been permitted to rise, even under attempts at control, it may well have risen to the World War I price of 26 cents. The premium payment, in the light of the existing ceiling, cannot then be said to have been a subsidy over and above the actual value of the mine proceeds. It was, rather, a partial restoration to the producer of the value of his product lost to him by imposition of the ceiling.

In summation, then, the circumstances of our war economy and the necessities of war production demanded additional production which could not be brought out without the incurring of extra costs by the producer. Such production therefore necessitated the making of extra-cost compensation to the producer in addition to the 12 cents per pound. Can it reasonably be said that the character of such compensation varied as alternative methods or techniques were employed by the government in its experimental efforts to find the program most generally satisfactory? If so, it must also be said that the "value" of the mine product varied accordingly, dependent not on those economic factors which would ordinarily affect it; dependent not on the extent of compensation received nor the considerations which prompted such compensation; but rather dependent entirely upon administrative method in the providing of such compensation. In our view such a proposition cannot be supported as reasonable.

In our reasoning and analysis we therefore follow the

views of the Utah Supreme Court. Combined Metals Reduction Company v. State Tax Commission, 111 Utah 156, 176 P.2d 614; United States Smelting, Refining and Milling Company v. Haynes, 111 Utah 172, 176 P.2d 622; Combined Metals Reduction Company v. Tooele County, 111 Utah 188, 176 P.2d 630; Kennecott Copper Corporation v. State Tax Commission, Utah, 212 P.2d 187. The premium payments here involved are held to be mine proceeds and accordingly subject to tax. · The judgment of the trial court is affirmed with costs.

BADT, C. J., and EATHER, J., concur.