# KENNECOTT COPPER CO. et al v. STATE TAX COMMISSION.

No. 7298. Decided Aug. 24, 1950. (221 P. 2d, 857).

Rehearing denied Jan. 2, 1951.

See 61 C.J. Taxation, Sec. 841. Franchise tax computed after deducting federal tax, 35 A.L.R. 1457. See, also Am. Jur., 733.

*C. C. Parsons, W. M. McCrea, A. D. Moffat, Calvin Behle,* all of Salt Lake City, for plaintiffs.

*Wayne Christoffersen,* Salt Lake City, for defendant.

LATIMER, Justice.

Certiorari to the State Tax Commission to review a decision assessing a franchise deficiency tax against the petitioner, Kennecott Copper Company.

This controversy was developed before the State Tax Commission on an agreed statement of facts, as augmented by a brief formal hearing. The testimony given at the hearing was limited in its scope and was largely for the purpose of explaining and amplifying the facts stated in the stipulation, with the result that the parties argue little over the facts. Insofar as necessary to a proper determination of the issues involved, the facts are as follows:

The Kennecott Copper Corporation is a New York corporation doing business in this and other states. It owns and operates the Utah Copper Mine, the Bingham and Garfield Railway Company and certain mills all located in this state. The corporation franchise tax returns of the

railroad company are consolidated with those of the Utah Copper Division of Kennecott and for all purposes herein the transportation operations are included as part of the Utah Copper Division operations. The ores from the Utah Copper Mine are carried to Kennecott's Magna and Arthur mills over the Bingham and Garfield Railway and there milled. Under a contract arrangement with certain smelting companies the mill concentrates are then smelted and the product of the smelting (blister copper) is then transported by Kennecott to refineries which are outside the State of Utah. Kennecott has no interest in any of the smelters or in any of the common carriers used to transport the smelted products outside the state. The refined product is sold for Kennecott's account by Kennecott Sales Corporation, a wholly owned subsidiary, and one which receives an agreed commission for its services. Kennecott's operations are extensive, it purchases large quantities of supplies and equipment in and out of this state, and it engages the services of and pays a substantial number of employees in states where it operates.

At some date prior to the year in controversy, there had been a change in the operation of the Utah Mining property and Kennecott, in effect, merged the affairs of the Utah Copper Company with those of other divisions. However, a separate accounting system was maintained for the Utah Copper Division. For the taxable years 1935 to 1941 inclusive, the Utah State Tax Commission and Kennecott had a controversy as to the method of determining the proper proportion of Kennecott's Utah Copper Division income to be allocated to the State of Utah and over the proper formula for determining the amount to be allowed this division for depletion under the corporation franchise tax act. While that controversy was pending before this court, a settlement was reached between the parties and by stipulation the proceedings were dismissed under date of May 27, 1942. By that settlement, it was agreed that 66.926

percent of Kennecott's Utah Copper Division income alone was to be allocated to this state. In addition, the terms of that agreement settled all questions concerning Kennecott's Utah Copper Division franchise tax liability for the years 1935 to 1941 inclusive.

Subsequently, the Utah Copper Division filed a franchise tax return for the year 1942 and paid the amount it claimed due by using the formula agreed upon in the settlement agreement for the prior years. The State Tax Commission refused to accept the tax report furnished by the Company and by letter of March 10, 1945, proposed certain adjustments which were opposed by Kennecott. The Tax Commission concluded that Kennecott had improperly computed the Utah Division's tax liability and a deficiency assessment was imposed.

Kennecott filed a petition for redetermination of the assessment. In the petition, it alleged that the mining, processing, sale and distribution of metal was an operation of Kennecott and not of a division; that the single purpose of the company was the production and sale of refined metals; that the mining of the crude ores and their concentration and smelting was accomplished within the State of Utah; that the delivery of the refined metals and their sale and distribution were accomplished wholly outside the state; that the operation was indivisible; that Kennecott's business within the State of Utah was wholly interstate in character; that it had not transacted any intrastate business and was not, therefore, subject to tax; that the action of the Tax Commission in disallowing the items claimed in Kennecott's return was in violation of the provisions of Title 80, Chapter 13, Sections 3, 6, 7 and 8, Revised Statutes of Utah, 1933; that the method of computing the tax used by the company had been settled by agreement between the commission and the taxpayer and that the return was filed in accordance with this agreement;

that the adjustments proposed by the State Tax Commission were arbitrary and unreasonable and a departure from the settlement and compromise agreement; that the commission was estopped from departing from the settlement agreement of 1942; that in its return for the year 1942 Kennecott had used the formula agreed upon by the compromise and settlement agreement; and that its return was filed pursuant to that formula. This petition, filed in 1945, covered in detail the objections made to the deficiency assessment, but no requests were made to allow the Utah Division to change either its method of accounting or its manner of determining its depletion allowance.

While a number of items were called into dispute before the State Tax Commission, the Commission concluded the taxpayer was entitled to certain claimed deductions and the parties have by agreement or assignment of error limited the remaining allowances or deductions in dispute to three items. The first of these is whether the federal income tax must be deducted before applying the statutory formula to determine the amount allowed for depletion. The second disputed item involves the question as to whether any net income, if derived from transportation, smelting, refining and selling, must be deducted from Utah Copper Division's net income before applying the statutory factor applicable to depletion. The third item depends upon whether subsidy payments made by the federal government for overproduction of ore must be included as part of Kennecott's Utah Copper Division income.

The Commission, in its findings, ruled against the taxpayer on all three of the disputed items. In addition, the Commission refused to compute Kennecott's tax liability on a changed method of accounting or to permit Kennecott the right to change from a percentage method of determining depletion to a cost method or to a method not specifically provided for by statute. It is from these adverse

rulings that the taxpayer appeals, and in this court it raises five assignments of error which cover the disputed items in the tax report and other rulings of the Commision claimed by Kennecott to be prejudicial. The errors assigned are as follows: (1) That the Tax Commission erred in refusing to follow the requirements of Section 80 —13—21, U. C. A. 1943, which would permit Kennecott to allocate to Utah a proportionate part of its total income from all sources as distinguished from allocating a proportionate part of the Utah Division's income to this state; (2) the State Tax Commission erred in not permitting Kennecott a reasonable allowance for depletion; (3) that the commission misinterpreted the Utah statutes prescribing the percentage formula for determining depletion; (4) that the Tax Commission erred in discriminating against Kennecott; (5) that the Tax Commission erred in including in the tax base subsidies paid to Kennecott by the federal government.

We summarily dispose of petitioner's last contention. Petitioner tried substantially this same question in the United States District Court for the district of Utah. On appeal the Circuit Court of Appeals in the case of *Salt Lake County* v. *Kennecott Copper Corporation,* 10 Cir., 163 F. 2d 484, held that the subsidies paid by the federal government were properly included as part of the gross proceeds realized from the sales or conversion of ore. The Circuit Court of Appeals relied on two previous decisions of this court, namely, *United States Smelting, Refining & Mining Co.* v. *Haynes,* 111 Utah 172, 176 P. 2d 622, and *Combined Metals Reduction Company* v. *State Tax Commission,* 111 Utah 156, 176 P. 2d 614. Pettitioner substantially concedes that these decisions render its contention on this point untenable. Moreover, this court in the recent case of *Kennecott Copper et al* v. *State Tax Commission,* 116 Utah 556, 212 P. 2d 187, again held that for tax purposes subsidy payments were to be in-

cluded as part of the gross proceeds realized from the property. Their inclusion in gross income is therefore required.

Likewise, we dispose of petitioner's contention that federal taxes need not be deducted before applying the statutory formula to determine the depletion allowance. In *New Park Mining Company* v. *State Tax Commission,* 113 Utah 410, 196 P. 2d 485, 486, we passed on the identical question. Mr. Justice WOLFE, speaking for the court, disposed of the same contention in the following language:

"We have heretofore set out, the essential provisions of Section 80—13—7 and 80—13—8, U. C. A. 1943. The former statute defines net income as 'gross income * * * less the deductions allowed by Section 80—13—8.' The latter enumerates the various items to be deducted from gross income to determine net income. In making their argumnt plaintiffs have either overlooked or wholly ignored subsection (3) of Section 80—13—8. That subsection provides, in language which could hardly be made more clear, and certainly cannot be said to be ambiguous or uncertain, that taxes 'paid or accrued within the taxable year' are one of the items to be deducted from gross income in order to determine net income. And subsection (9) (b) provides, in terms of equal clarity, that the allowance for depletion shall be 33⅓ per cent of the net income from the property. This is determinative of the case, for even if there were administrative interpretation such as plaintiffs assert, this court could not permit such an interpretation to stand in flat contradiction to the clear terms of the statute. Since the statute, by its express terms provides that taxes shall be deducted from gross income to determine net income, it follows that plaintiffs were not entitled to compute depletion, before deducting federal taxes. * * *"

For a proper disposition of the first assignment of error, it is necessary to refer to the history of Kennecott's accounting practice and the method used by it in reporting the Utah Copper Division to the State Tax Commission. Since the inception of the corporation franchise tax act the State Tax Commission has considered the Utah operations of Kennecott as a separate and distinct unit for corporation franchise tax purposes, and so has Kennecott. Its books are kept on that principle and all corporate franchise tax returns, except the one in dispute, have been pre-

pared and filed by Kennecott on that basis. The receipts, expenditures, costs of operation, income and deductions are determined by treating the Utah Mines Divisions as a separate unit. This method must be used for certain purposes as the depletion deduction to be allowed by both the federal and state agencies must be determined on the income from the property located within this state and the franchise tax herein disputed must be computed by determining the amount of income allocated to the business transacted in this state. It would be impractical for both state and federal agencies to deal with the complicated tax problems involved unless the affairs of the Utah Copper Division were separable from Kennecott's other operations. Apparently Kennecott did not consider filing its tax returns on any basis other than that of a separate operating unit until the present difficulty arose in 1942, and it subsequently asserted its right to change its method of accounting for franchise tax purposes because it concluded the State Tax Commission had unfairly departed from the principles used in the compromise settlement for the previous years. However, the request for this change does not appear to be included as one of the grounds set forth in the petition for redetermination and, apparently, was not made until some time in 1948. Had the request been granted at that late date it would have resulted in a substantial change in accounting procedure and would have complicated and not simplified what was already a difficult tax question. It must be kept in mind that the proposed change did not seek to apportion the income of the Utah Division alone, but sought to determine the net income assignable to this state by pooling all divisions of Kennecott and then applying the formula prescribed by the statute.

Kennecott relies on Section 80—13—21, U. C. A. 1943, which deals with inclusion and exclusion of income received from within and without the state and which sets

forth the rules for determining net income allocated to this state. The section provides a method for determining the portion of net income assignable to business done within this state and it mentions income received from rents, interest, dividends, and gains from the sale of capital assets, and sets forth certain definite rules with respect to allocation. It then provides for a method of determining the remainder of income allocated to this state and prescribes a formula for determining the portion of the income so alloted. In a general way, the formula requires a determination of three factors: (1) The value of the property located in this state as compared to the value of property wherever situated; (2) the amount of wages, salaries, commissions, paid in this state as compared to the same expenditures made to all employees wherever working; and (3) the gross receipts from business assignable to this state as compared to the gross receipts from all business regardless of where transacted.

The last paragraph of the section provides as follows: "(8) If in the judgment of the tax commission the application of the foregoing rules does not allocate to this state the proportion of net income fairly and equitably attributable to this state, it may with such information as it may be able to obtain make such allocation as is fairly calculated to assign to this state, the portion of net income reasonably attributable to the business done within this state and to avoid subjecting the taxpayer to double taxation."

The State Tax Commission apparently concluded that to permit the petitioner to prepare the return differently than had been the custom would not allocate to this state a proportion of the Utah Copper Division's net income fairly and equitably attributable to business done within this state. And that to require filing in accordance with the custom would not subject the Utah Division of Kenne-

cott to double taxation. Accordingly, the Commission disregarded the request for change and treated the original accounting method as controlling.

We see no good reason for reversing the State Tax Commission on this ruling and see many practical difficulties had a different method been permitted. In some instances, the actual net income to be allocated to business transacted in this state cannot be fixed with certainty so the legislature set up one method and then clothed the Commission with the power to permit selection of another method if it would more accurately reflect the true net income. By the provision of subsection (8), 80—13—21, U. C. A. 1943, supra, the legislature granted to the State Tax Commission some discretion to modify the prescribed statutory method and before we can interfere with the method imposed on or used by the taxpayer it must appear the commission acted arbitrarily and abused its discretion. We fail to discover a showing sufficient to permit our interference as no abuse of discretion has been established by the petitioner. Kennecott's books are kept on the basis used by the commission in determining the deficiency and must of necessity be so kept to furnish the desired information to both the federal and state authorities. The franchise tax reports filed up until the year 1947 were based on the prescribed system aside from certain contested items they suggest a fair and equitable means of determining the tax liability. To use the method set out in the first subparagraphs of the section might introduce variable factors, some imposible of ascertainment, such as the relative value of mines or mining property. The determination of this factor alone might lead to endless and unsatisfactory litigation. In addition it might unjustly discriminate against this state or the taxpayer in that the tax assessed might bear no reasonable relationship to the value of the ore extracted or the amount of business done in this state.

Petitioner refers us to the case of *California Packing Corporation* v. *State Tax Commission,* 97 Utah 367, 93 P. 2d 463, 468, as authority for its contention that the State Tax Commission acted arbitrarily in not permitting the company to belatedly change its accounting method. We quote from both opinions in that case to establish that we recognized the right of the State Tax Commission to rely on subparagraph (8) when strict compliance with the other rules and regulations might result in an inequitable allocation to the state or when the taxpayer is subjected to double taxation.

Mr. Justice LARSON, author of the majority opinion, stated as follows:

"One further matter is presented in the issues as framed and argued. This involves the construction and meaning of subsection (8) of Section 80—13—21, reading as follows:

" 'If in the judgment of the tax commission the application of the foregoing rules does not locate to this state the proportion of net income fairly and equitably attributable to this state, it may with such information as it may be able to obtain *make such allocation as is fairly calculated to assign to this state the portion of net income reasonably attributable to the business done within this state and to avoid subjecting the taxpayer to double taxation.*' (Italics added.)

"We have italicized the clause that gives rise to the argument. The Company contends that the last clause is controlling and the Commission can depart from the statutory formula set forth in the first seven subsections of the section only when such departure is necessary 'to avoid subjecting the taxpayer to double taxation.' The Commission takes the position that the subsection is a general grant of power to depart from the statutory formula whenever that may be necessary in order to allocate to the state for tax computation purposes the proper proportion of the net income fairly attributable to business done in this state. And upon such construction the Commission justifies its action in redetermining the tax against the Company rather than upon the construction of subdivision (e) discussed and construed above. As far as statutory construction is concerned we think that subsection (8) is a general section authorizing the Tax Commission to depart from the formula set out in subsection (6) whenever the application of the provisions of that subsection does not allocate to the state the business fairly attributable to the state or whenever such application results in double taxation. But we do not think that the present case has been shown to be one calling for a departure from the statutory formula. * * *"

Mr. Justice WOLFE, in his concurring opinion, arrives the same conclusion. He states his interpretation of that subsection to be as follows: "I concur in the holding that subsection (8) of Section 80—13—21, R. S. Utah 1933, grants authority to depart from the rules where that is required to be fair either to the state or to the taxpayer. The very reading of subsection (8) precludes any other construction. In determining the 'portion of net income assignable to business done *within* this state' the commission 'may' use the rules set out in the main opinion. This does not mean that the Commission may ignore the rules and choose its own. 'May' has the meaning of 'should' i. e., should follow the rules unless the rules fail to accomplish the overarching purpose as revealed by subsection (8). It is only in case an application of the rules as laid down fails to 'allocate to this state the proportion of net income fairly and equitably attributable to this state' [subsection (8)], or on other hand, where the rules would subject the taxpayer to so-called double taxation that the Commission may depart from them."

The problem that concerns us here is not that the commission seeks to force the taxpayer to a non-statutory basis. On the contrary, the Commission has permitted the taxpayer to file on a basis selected by it which the taxpayer seeks to change because the amount of tax has become onerous. Such a request may be entirely legitimate but when as here there are factors which cannot be determined with any degree of satisfaction, the request is made some six years after the tax has accrued and the only reason assigned is that the change may substantially reduce the tax liability, the showing is not sufficient to convince us that the Commission was arbitrary and capricious in denying the request. Petitioner's contention in this respect is overruled.

To determine the validity of the second assignment of error it is necessary that we refer to section 80—13—8,

U. C. A. 1943, subsections (9) (a) and (b), which provide as follows:

"(9) (a) The basis upon which depletion, depreciation, exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the same as is provided in Section 80—13—14 for the purpose of determining the gain or loss upon the sale or other disposition of such property, except as hereinafter in this section provided.

"(b) The allowance for depletion shall be thirty-three and one-third per cent *of the net income from the property during the taxable year*, computed without allowance for depletion, or on the basis provided in subsection (9) (a), as the taxpayer may elect. The basis which the taxpayer elects under this subsection shall be the basis used in subsequent accounting periods and shall be changed thereafter only with the consent of the tax commission." (Emphasis supplied)

Section 80—13—14, U. C. A. 1943, referred to in (9) (a) above, deals with the basis for determining gains or losses from the sale or other disposition of property acquired after December 31, 1930. That basis has been referred to as cost depletion. Up until this controversy arose, petitioner always elected to compute depletion under subsection (9) (b) rather than (9) (a).

If we were to limit our discussion to the provisions of these two subparagraphs it would appear that there are only two methods for determining depletion; one is the percentage method and the other is the cost method. Petitioner, however, calls our attention to subparagraph (8), of Section 80—13—8, U. C. A. 1943, which provides as follows: "(8) In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, *according to the peculiar condition in each case;* such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the tax commission. In the case of leases, the deduction shall be equitably apportioned between the lessee and the lessor." (Emphasis supplied.)

Its contention is that if depletion be limited to the two methods prescribed in subscription (9) that such a construction overlooks the underscored provision of subsection (8). That phrase could be construed to mean that the most appropriate selection of the two methods prescribed by statute should be dicated by the peculiar conditions of each case. Or it may well be that the legislature intended to confer authority upon the Commision to use another method if a situation arose which would make both the percentage depletion and cost depletion un-

reasonable. We need not determine those questions as Kennecott had its option to select the method it desired to use and over the period of years it has continued to use the percentage depletion method. This seemed to be an entirely satisfactory method until the State Tax Commission commenced requiring Federal taxes to be deducted before applying the depletion percentage. The statute requires the taxpayer to continue to use the selected method unless consent of the Commission is obtained to change. This statute, while permitting a change, presupposes a timely request and not one made long after the return is submitted and a deficiency determined. A change in the administrative regulations might be good grounds for requesting a change in accounting practice, but again, the request should not be unduly delayed and some substantial reason for the change should be advanced by the taxpayer so that the Commission is not faced with repeated requests to change systems merely for the purpose of escaping tax liability.

Petitioner sought to convince the Commission and seeks to convince this court that a more equitable and fair basis would be by adopting the formula used by the Federal Government. The formula used in Federal returns permits 15 percent of the gross proceeds, but not to exceed 50 percent of the net, to be deducted. The adoption of that method for the year in question might be more advantageous to Kennecott but that reason alone ■ does not require the State Tax Commission to permit its use. Petitioner had previously selected one of the methods set up by the legislature and the burden is upon it to establish that the peculiar conditions existing in its case are such as to reasonably require the Commission to permit the adoption of another method. Assuming that the Commission might, if conditions justify, adopt a basis of determination different from the two provided by statute, we are not convinced that the petitioner has es-

tablished an abuse of discretion on the part of the Commission merely because another system might reduce the tax load. That the tax liability is larger than it would be if petitioner were granted permission to switch systems does not compel a finding of arbitrariness. To hold otherwise would require the Commission to abandon the statutory methods each time the taxpayer asserted the tax was excessive.

The third and fourth assignments of error are largely interrelated and will be discussed together. In connection with these assignments it is well to point out Kennecott's unusual method of operation. The Utah Division either performs or is directly involved in digging the ore from the ground; transporting the ore, concentrates, the blister copper, milling the ore at the mills; having the ore smelted at smelters; and, eventually selling the metals recovered. The transportation systems and the smelters are not owned by Kennecott but the mills and selling organization are. After the ores are milled they are shipped to smelters for the account of Kennecott. and title to the product remains in Kennecott until such time as the minerals are sold by the Kennecott Sales Corporation. The problem that is unique and that is brought into focus by this operation is that by statute, depletion is limited to net income received from the property, and the post-mining operations of Kennecott invade fields not usually associated with extraction and sale of ores. Kennecott claims that the costs of all these post-mining activities should be charged against its gross income to arrive at its net income for depletion purposes, but that no net income is attributable to these post-mining operations. The State Tax Commission, on the other hand, takes the narrower view that section 80—13—8 (9) (b), U. C. A. 1943, requires that depletion be limited to a percentage of the net income from the property and that part of Kennecott's Utah Copper Division net income is realized from its milling, smelting, and sales operations

and not realized from the Mining property. As a consequence of the view taken by the Tax Commission, the deficiency tax was computed by splitting total net income between net income from the property and net income from smelting, refining, transportation and selling, or what we shall designate as fabrication and sales income.

The State Tax Commission, being unable to obtain from Kennecott a breakdown of estimated income allocated to mining operations and to fabrication and sale, conceived and used a formula which it believed made a fair and reasonable allocation. Reduced to its simplest form, the formula was based on the supposition that mining income bore the same relationship to fabrication and sale income as mining costs bore to the post-mining operation costs. Stated another way, if the mining costs equalled the fabrication and sale costs then the income to be credited to mining operations would be equal to the income credited to the post-mining operations. By using the prepared formula, the Commission concluded that sixty-eight percent of Kennecott's net income should be credited to mining operations and thirty-two percent to post mining activities. It may be that the use of the formula was inappropriate because of using estimated, questionable or unknown factors, but the final percentages used so closely approximated the allocation used by Kennecott when it submitted its original return that it is doubtful that any prejudice resulted.

Counsel for both the Commission and the petitioner have referred us to cases arising under different statutory provisions or administrative regulations. While they suggest paths to be followed, the difference in statutory guideposts requires a different approach in this case. Generally speaking, the phrase "income from the property" means the income from mining. The latter term is usually understood to mean not merely the extraction

of ores or minerals from the ground, but also the ordinary treatment processes normally applied by operators in order to obtain the commercially marketable mineral product. In those cases where the operator sells direct to the smelter and payment is made on the net smelter returns, little difficulty is encountered. Here, however, we go far beyond that as Kennecott is the owner from the time of digging to the day of selling. Undoubtedly each of the post-mining processes appreciates the value of the product and this is reflected in increasing the net income to Kennecott. If the total net income were allocated to this state then we might be faced with the difficult question as to whether we were not on the one hand permitting the post-mining operations to increase the franchise tax due the state and on the other hand denying the taxpayer the right to the increased income for depletion calculations. However, when the taxpayer allocates the net income received from the appreciation to out of state net income, another question presents itself.

Because of the arithmetical difficulties to be encountered in computing the final tax, the parties have assumed the responsibility of making the final determination based on the principles we enunciate. Partly for this reason and partly because certain difference must be reconciled in analyzing this last contention and in illustrating our concept, we used only approximate figures.

When Kennecott filed its original 1942 return, it showed a total net income of $8,617,511.00 for the Utah Division. Because it contended all of this net income was not earned in the State of Utah, it used an allocation factor of 66.926 percent of the income attributable to business done in this state. (It should be noted at this point that this is the same factor used by the Commission in determining the deficiency tax.) By applying this factor to the total net income of the Utah Division, Kennecott determined that

$5,803,351 of its total net income should be allocated to Utah. Both of the quoted figures are net income, after depletion, and $13,568,213 is shown in Kennecott's books as the amount deducted for this item. The depletion deduction used was excessive because Kennecott did not take out federal taxes paid before determining the net income for depletion purposes. Accordingly, if we put back the amount taken out for depletion, we get a total net income, before depletion, of $22,185,807, and an allocated net income to Utah of $19,371,565. By applying the 33 1/3 percent depletion factor to these two amounts we get a depletion deduction of approximately $7,395,269 in the first instance, and $6,457,188 in the last instance. The State Tax Commission used a slightly higher total net income in determining the deficiency tax and split it 68 percent to mining income and 32 percent to post-mining income. By so doing, it allowed a depletion deduction of $6,455,813.

We cast aside any attempt to reconcile the differences in total net income as we believe our holding will make it possible for the parties to determine the exact amount. We believe that if the taxpayer claims that all net income is not earned in this state, that the portion allocated to business done outside this state must, of necessity, not be income from the property within the meaning of our statute. We are unable to determine whether the post-mining activities produce 32% of the net income of the Utah Division, but Kennecott claims they do and the Tax Commission has conceded that point in this case. The taxpayer in its petition for redetermination alleges that its operations are indivisible but it, nevertheless, makes a percentage allocation between the activities carried on in this state and the post-mining activities performed elsewhere. Therefore, if any net income is attributable to business done elsewhere, it must come from operations which would not be considered ordinary treatment processes normally applied by operators. The taxpayer in this instance is in

a rather inconsistent position to assert that net income pertaining to business performed outside this state can be considered as net income from the property. By splitting its income between this state and other places, the taxpayer has established that it can assign portions of its income to mining operations and to post-mining activities.

We need not place our approval on the formula used by the Commission or arbitrarily determine the breakthrough point between mining operations and post-mining activities. All we need do in this case is to point out that there are two possible paths for the taxpayer to take. The Commission might agree that it take either but it cannot traverse both. Either the net income is from property and should be allocated to this state, or the net income is from both the property and the post-mining activities and they are not so related that the net income cannot be roughly allocated to both sources. The lengths to which the taxpayer might go under its theory is aptly illustrated by the figures used in its first return. From an approximate net income, before depletion, in this state of $18,000,-000, Kennecott seeks to establish a depletion allowance of $13,000,000. This is far in excess of the 33 1/3 percent provided for by statute.

In disposing of this last contention, we hold that if Kennecott files its return on an allotted basis that it must allocate some of its net income to post-mining operations before computing depletion.

The case is remanded with instructions to determine and enter a deficiency judgment in accordance with the views herein expressed.

WADE, WOLFE, and McDONOUGH, JJ., concur.

PRATT, Chief Justice (concurring in part).

In view of previous decisions of this court and the Federal decision cited in the prevailing opinion, upon the sub-

ject of including subsidies as part of the tax base, I concur with the prevailing opinion's disposal of that alleged error. I also believe that the New Park Mining Company case (cited) disposes of the federal tax issue.

Upon the issues of allocation of income to the state, and depletion, I submit the following:

The legislature of this state has established a formula for allocation of net income to this state where the corporation does business outside of this state. Section 80—13—21, U. C. A. 1943. Paragraph 8 of that section provides that if, in the judgment of the Commission, the application of this formula *"does not"* allocate to this state the proportion of net income fairly and equitably attributable to this state, the Commission may make such allocation as will be fairly calculated to assign to this state a part of net income reasonably attributable to business done in this state. We have decided that the Commission "should" follow the legislative formula, unless it fails to accomplish the purpose of the formula. (See quotations from *California Packing Company* v. *State Tax Commission,* cited in the prevailing opinion.)

With such a foundation upon which to act, neither the Commission nor this court should reject the formula because of the laborious task possibly attendant upon its application. Paragraph 8 of Section 80—13—21, U. C. A. 1943, does not say that the Commission may select its own method of procedure, if by reason of the size of the company or the ramifications of its business the task of applying the formula "may" or "might be" insurmountable. To attack the application of the formula upon possibilities of complications in that application is, in effect, to attack the formula for its inherent deficiencies, and the remedy for that lies with the legislature, not with the Commission, nor with the court. Paragraph 8 says the Commission may act on its own formula if the legislative form-

ula *"does not"* allocate properly, not because under possible future contingencies it *"might not"* make a proper allocation. This distinction becomes important upon a review such as this for this reason:

If we measure the Commission's action only by possibilities, then the review becomes almost useless, as many very logical future possibilities may be imagined. On the other hand, if their action is measured by actual results, then, upon review the court may have something specific to look at to see if there is a reasonable foundation for the Commission to conclude that the application of the formula *"does not"* make a proper allocation—and incidently, if it be the fact, the mere increase in the amount of tax the state may collect, would not be sufficient foundation for the Commission to reject the legislative formula.

Under Section 80—13—47, this court in reviewing the decision of the Commission, may consider both law and fact. In the present case, to uphold the Commission on the theory propounded by paragraph 8 of Section 80—13 —21, the court shall be able to find in the record facts that are probative of the inefficacy of applying the formula to this corporation. It is only by measuring the Commission's action in the light of those facts that we may determine whether or not their action was an abuse of discretion. I am having difficulty putting my finger on those facts in view of the weight given to abstract principles in the arguments.

As to the company having made a selection of the method of estimating depletion under Section 80—13—8, U. C. A. 1943, I have only this to say: what the parties have agreed to in settlement of previous controversies should not bind one party if it did not the other. The rejection by the Commission of its previous stand in the matter should throw the door open to the company making a selection as contemplated by the section of the code involved.